133 T.C. No. 3

UNITED STATES TAX COURT

FRANK SAWYER TRUST OF MAY 1992, TRANSFEREE, CAROL S. PARKS,
TRUSTEE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5526-07.                    Filed August 24, 2009.


    P owned the stock of four corporations:  TT, CT,
St. Botolph, and Sixty-Five Bedford.  The four
corporations held assets with high fair market values
and low adjusted bases.  During 2000 and 2001 the
corporations sold their assets, leaving the
corporations with large cash reserves and facing large
contingent tax liabilities.

    Shortly after the respective asset sales, P sold
its stock in the corporations to F.  F, after
purchasing the stock, transferred assets with inflated
bases to the corporations.  The corporations then sold
these assets, generating losses.  The losses were used
to offset the corporations' large capital gains.  As a
result of the claimed losses, the corporations did not
pay tax on the asset sales.  Later F stripped the
proceeds of the asset sales from the corporations.

R issued notices of deficiency to P, determining deficiencies in P's fiduciary income tax on account of the sale of the corporations' stock and imposing sec. 6662, I.R.C., accuracy-related penalties. P petitioned this Court, and P and R entered into decision documents finding that there were no deficiencies in tax and that P was not liable for sec. 6662, I.R.C., accuracy-related penalties. These decision documents were the result of a stipulated decision between the parties and not a trial on the merits.

R later examined the corporations' tax returns. R and the corporations entered into closing agreements which disallowed the claimed losses and imposed sec. 6662, I.R.C., accuracy-related penalties on the underpayments of tax. The corporations, having been stripped of the proceeds of the asset sales, lacked the funds necessary to pay the assessed tax.

R issued notices of transferee liability to P attempting to collect the corporations' unpaid tax liabilities from their former shareholder. P petitioned this Court and has filed a motion for summary judgment arguing that: (1) Res judicata bars the instant transferee liability action; and (2) in the alternative R is collaterally estopped from arguing in this transferee liability action that there were deemed liquidating distributions from the corporations to P.

Held: Res judicata does not bar the instant action because the cause of action in the earlier deficiency cases is not the same as the cause of action in the instant transferee liability action.

Held, further, R is not collaterally estopped from arguing in this proceeding that there were deemed liquidating distributions because the decision documents entered into by P and R to resolve the deficiency cases do not indicate that the parties intended to resolve the questions whether there were deemed liquidating distributions from the corporations to P and the deficiency cases dealt with deficiencies in P's fiduciary income tax, while the instant action deals with P's liability as a transferee of the corporations.

David R. Andelman and Juliette Galacia Pico, for petitioner.

Kevin G. Croke, for respondent.

OPINION

GOEKE, Judge:  This case is before the Court on the trust's motion for summary judgment filed pursuant to Rule 121.[1] Respondent has asserted transferee liability against the trust. The trust argues in its motion papers that the doctrines of res judicata and collateral estoppel bar this transferee liability action.  The trust argues that the issue of whether the trust is liable for the unpaid tax liabilities at issue was decided in a prior deficiency action after respondent issued notices of deficiency to the trust.  The parties agree that there are no material facts in dispute.  For the reasons stated herein, we will deny the trust's motion.

Background

The trust has a mailing address in Boston, Massachusetts. Respondent issued notices of transferee liability asserting that the trust is liable as transferee for the unpaid income tax liabilities of four corporations:  (1) TDGH, Inc. (Town Taxi);

---

[1]Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code.

(2) CDGH, Inc. (Checker Taxi); (3) St. Botolph Holding Co. (St. Botolph); and (4) Sixty-Five Bedford Street, Inc. (Sixty-Five Bedford) (collectively, the corporations).

Two types of transactions occurred during the 2000 and 2001 tax years. First, the corporations sold substantially all of their assets to unrelated third parties. The asset sales were followed by the trust's sale of its stock in the corporations to a different unrelated third party.[2] The trust owned all of the stock of the corporations before 2000.

A. Asset Sales

Town Taxi and Checker Taxi provided taxicab services in Massachusetts. The two companies' primary assets were taxicab medallions that were required by the State licensing agencies in order to provide taxicab services. St. Botolph and Sixty-Five Bedford owned real estate used in the operation of Town Taxi's and Checker Taxi's taxicab businesses. St. Botolph owned a parking garage, while Sixty-Five Bedford owned two additional parcels of land.

---

[2]In notices of deficiency and the notices of transferee liability discussed below, respondent asserted that the asset sale followed by the stock sale was part of an integrated plan known as an "intermediary transaction" entered into by the trust solely to lower its tax liability. See Notice 2001-16, 2001-1 C.B. 730. We do not determine at this stage of the proceeding whether respondent's characterization of the asset sales and stock sales as an intermediary transaction is correct.

In 2000 Town Taxi and Checker Taxi sold substantially all of their assets to unrelated third-party purchasers. Town Taxi and Checker Taxi recognized gain on the sales and were left with large cash holdings. Unless able to offset those gains with losses, Town Taxi and Checker Taxi would face large contingent tax liabilities. Town Taxi filed a Schedule D, Capital Gains and Losses, with its Form 1120, U.S. Corporation Income Tax Return, showing proceeds of $18,468,900 from the sale of the medallions. Town Taxi claimed a basis of $2,740,000 in the medallions, resulting in gain of $15,728,900. Checker Taxi's Schedule D indicated proceeds of $17,578,000 from its sale of the taxicab medallions. Checker Taxi claimed a basis of zero in its medallions, resulting in gain of $17,578,000 on the sale.

In 2001 St. Botolph and Sixty-Five Bedford sold their respective parcels of real estate to two different section 501(c)(3) educational institutions. Like Town Taxi and Checker Taxi, St. Botolph and Sixty-Five Bedford recognized gain on the sales and were left holding large amounts of cash. St. Botolph's Schedule D showed proceeds from the land sale of $22 million. St. Botolph's claimed a basis of $1,102,509 in the land, resulting in gain of $20,897,491. Sixty-Five Bedford's Schedule D showed proceeds of $1,180,000 from the sale of two properties. Sixty-Five Bedford claimed a basis of $942,000 in these properties. Sixty-Five Bedford also reported on its Schedule D

gain of $4,253,474 on its Form 4797, Sales of Business Property. This resulted in total gain of $5,195,474.

B. Stock Sales

A representative of the trust received a promotional letter from Midcoast Credit Corp. (Midcoast) before Town Taxi and Checker Taxi's sales of the taxicab medallions. The promotional letter indicated that Midcoast was interested in acquiring C corporations with significant capital gains. Town Taxi and Checker Taxi were corporations with a potential to realize significant capital gains, and the trust's representatives contacted Midcoast. Because the corporations' potential capital gains were so large, Midcoast brought in Fortrend International, L.L.C. (Fortrend). Fortrend was involved in the stock sales because its business relationships provided it with greater access to capital than Midcoast had. Representatives of the trust met with representatives of Fortrend, and Fortrend indicated that it was looking to purchase the stock of companies that had liquidated or were in the process of liquidating all their assets and had incurred or would incur large capital gains tax liabilities as a result. Fortrend indicated that it would pay a purchase price for the stock of such a company equal to the value of the cash and other assets less 50 percent of the amount of the income tax liability. The trust decided to sell the

corporations' stock to Fortrend, and the sales were consummated in 2000 and 2001.

1. Taxi Companies

The trust and Fortrend agreed that the total purchase price for the stock of Town Taxi and Checker Taxi would be the amount the trust would have received if Town Taxi and Checker Taxi had sold their assets, paid their tax liabilities, and distributed the remaining cash to the trust, plus 50 percent of the taxes which Town Taxi and Checker Taxi would ordinarily have to pay.[3]

The trust entered into stock purchase agreements dated August 7, 2000, with Fortrend under which the trust agreed to sell to Fortrend the stock of Town Taxi and Checker Taxi.[4] The stock purchase agreements provide a formula for the calculation of the purchase price: the purchase price would be equal to the

---

[3]Assume a corporation with $1 million of income and a 35-percent tax rate. The corporation would normally pay $350,000 of tax and distribute $650,000 to its sole shareholder as a liquidating distribution in exchange for his stock. The shareholder would then pay tax on any gain on the exchange of his stock. See sec. 331. Instead, by involving Fortrend, the trust would sell the stock of the corporation (holding $1 million cash) for $825,000. The trust would receive $175,000 (half of the corporation's tax liability) more than if it had liquidated the corporation. The $175,000 excess of cash in the corporation ($1 million) over the amount paid by Fortrend ($825,000) would be Fortrend's fee for entering into the transaction.

[4]In October 2000 the trust requested of Fortrend that it be allowed to retain the corporate names "Town Taxi" and "Checker Taxi". Fortrend agreed, and the two corporations whose stock was purchased by Fortrend were renamed TDGH, Inc., and CDGH, Inc., respectively. For purposes of continuity, we will refer to Town Taxi and Checker Taxi by the original names.

value of Town Taxi's and Checker Taxi's assets less 50 percent of the "specified remaining tax liability" of each.  The specified remaining tax liabilities were the Federal and State tax liabilities arising from the sale of each corporation's assets. The purchase price for the stock of Town Taxi was $14,850,701. The purchase price for the stock of Checker Taxi was $17,880,694.

2.  Land Companies

As discussed above, St. Botolph and Sixty-Five Bedford owned parcels of land.  The trustee of the trust decided after the taxicab medallions were sold in 2000 to sell these parcels of land.  After the land sales were completed, St. Botolph and Sixty-Five Bedford were in the same position that Town Taxi and Checker Taxi had just been in--holding large amounts of cash and facing large capital gains tax liabilities.  Representatives of the trust contacted Midcoast to determine whether Midcoast was interested in purchasing the stock of St. Botolph and Sixty-Five Bedford.  Midcoast was interested and again involved Fortrend.

The formula used to determine the total purchase price was similar to the one used to calculate the purchase price of the Town Taxi and Checker Taxi stock--the value of St. Botolph's and Sixty-Five Bedford's assets minus a percentage of their specified remaining tax liabilities.  The only difference was the applicable percentage, which was applied at 50 percent for both Town Taxi and Checker Taxi and 50 percent for Sixty-Five Bedford.

However, St. Botolph qualified for a lower rate of 37.2 percent. Fortrend paid $18,456,187 for the stock of St. Botolph and $4,916,834 for the stock of Sixty-Five Bedford.

C. The Trust's Tax Returns

The trust reported the stock sales on its fiduciary income tax returns for tax years 2000 and 2001. The trust reported the following on its 2000 income tax return:

| Entity | Date of Sale | Sale Price | Basis | Gain |
|--------|-------------|-----------|-------|------|
| Town Taxi | 10/9/2000 | $14,850,702 | $14,850,702 | -0- |
| Checker Taxi | 10/9/2000 | 17,880,694 | 17,880,694 | -0- |

The trust reported the following on its amended 2001 income tax return:

| Entity | Date of Sale | Sale Price | Basis | Gain |
|--------|-------------|-----------|-------|------|
| St. Botolph | 2/26/2001 | $18,480,194 | $6,985,296 | $11,494,898 |
| Sixty-Five Bedford | 10/4/2001 | 6,096,834 | 3,725,341 | 2,371,493 |

D. Notices of Deficiency and Examination of the Corporations' Tax Returns

Respondent examined both the trust's and the corporations' tax returns. Respondent issued statutory notices of deficiency to the trust for tax years 2000 and 2001 (the 2000 notice and the 2001 notice, respectively; collectively, the notices of deficiency). The notices of deficiency determined that the trust was liable for the following:

| Tax Year | Deficiency | Penalty Sec. 6662 |
|----------|-----------|-------------------|
| 2000 | $3,130,547 | $626,109 |
| 2001 | 843,090 | 168,618 |

The 2000 notice included an explanation of adjustments. It explained in pertinent part that the adjustments made to the trust's tax liability were due to changes in the trust's bases in the Checker Taxi and Town Taxi stock. It further explained that "In the alternative to stock sales, these adjustments reflect additional gains from the sale of assets by Checker Taxi Company * * * and Town Taxi, Inc. * * * and deemed distributions in liquidation."

The 2000 notice further explained that the Internal Revenue Service (IRS) position was that Town Taxi and Checker Taxi in effect sold all of their assets, paid off all of their liabilities, and liquidated. Because the trust was the sole shareholder of both Town Taxi and Checker Taxi, the trust received the liquidation proceeds and was required pursuant to section 331(a) to report the gain.[5] The notice in effect required the trust to recognize and pay tax on the entire amount received in the asset sales.

The 2001 notice also included an explanation of adjustments. It explained in pertinent part that "In lieu of the reported stock sales of these two corporations, your return is adjusted to reflect gains from deemed distributions in liquidation from the

_____

[5]Sec. 331(a) provides that amounts received by a shareholder in a distribution in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock. See Mueller v. Commissioner, T.C. Memo. 2001-178.

corporations following the corporations' sales of assets." The explanation of adjustments also included a memorandum explaining the legal basis for the changes made to the trust's Federal income tax return. The recharacterization of the stock sales resulted in the following treatment: (1) The corporations' selling their assets; (2) the corporations' liquidating and distributing all of the cash proceeds to the trust; (3) the trust's paying Fortrend its fee for entering into the transaction; and (4) the trust's not being entitled to a deduction for amounts paid to Fortrend. The notice calculated the trust's increased income and the deficiency by disallowing deductions for the amounts paid to Fortrend. In effect, the trust was treated as having sold the assets and distributed to itself all of the proceeds without paying any taxes. Thus because the deductions for payments to Fortrend were disallowed, the trust had a higher income than that reported on its return, the difference being the amounts paid to Fortrend.

The trust filed petitions in this Court contesting respondent's determinations. The trust filed a petition in docket No. 3702-05 for tax year 2000 on February 25, 2005, and in docket No. 12474-05 for tax year 2001 on July 7, 2005. On February 14, 2006, this Court entered decisions in both dockets, deciding that there was no deficiency in the trust's Federal tax liability for either of the tax years 2000 and 2001 and that the

trust was not liable for section 6662 accuracy-related penalties. The decision documents reflected a compromise by the parties and were not the result of a trial on the merits. Neither this Court nor the decision documents addressed any of respondent's theories for determining a deficiency. Nor were there any pertinent stipulations between the parties other than that the trust did not have a deficiency in tax or owe any penalties.

E.   The Corporations' Returns

As discussed above, Fortrend-controlled entities purchased the stock of the corporations. After the asset sales the corporations held large amounts of cash and faced large contingent tax liabilities. After purchasing the stock of the corporations, Fortrend transferred assets with inflated bases to the corporations. These assets consisted mostly of stock, discussed below. The corporations then sold these assets, generating an artificial loss. These artificial losses were used to offset the capital gains recognized on the sales of the taxicab medallions and the parcels of real estate. As a result, Town Taxi and Checker Taxi did not pay taxes on the income earned from the medallion sales while St. Botolph and Sixty-Five Bedford did not pay taxes on the gain from the land sales.

Town Taxi filed its Form 1120 for tax year 2000 on September 17, 2001, reporting proceeds of $18,468,900, and a basis in the medallions of $2,740,000. On Schedule D Town Taxi recognized

gain of $15,728,900 on the sale of the taxicab medallions. During 2000 Town Taxi sold stock in Trex Communications, which had been contributed by Fortrend to the corporation's capital. Town Taxi reported a sale price of $87,812 and a basis of $18,583,000, resulting in a loss of $18,495,188 on the sale. This resulted in a net long-term capital loss of $2,766,288.

Checker Taxi also filed its Form 1120 for tax year 2000 on September 17, 2001, reporting proceeds of $17,578,000 and a basis of zero. This resulted in Checker Taxi's recognizing gain of $17,578,000 on the sale of its taxicab medallions. During 2000 Checker Taxi sold stock in Paclaco Equities, Inc., and Trex Communications for $19,846 and $62,188, respectively. The Paclaco Equities, Inc. and Trex Communications stock had been contributed by Fortrend. Checker Taxi claimed bases in this stock of $3,786,000 and $13,160,000, respectively. This resulted in losses of $3,766,154 and $13,097,812 on the sales of the Paclaco Equities, Inc. and Trex Communications stock, respectively. This resulted in a net long-term loss of $714,034.

St. Botolph filed its Form 1120 for tax year 2001 on August 25, 2002, reporting the sale of a parking garage. St. Botolph reported a sale price of $22 million and a basis of $1,102,509 in the parking garage. This resulted in gain of $20,897,491 on the sale of the parking garage. During 2001 St. Botolph sold stock in Telcel Equity and Theodor Tower, Inc., contributed by

Fortrend, for $67,000 and $47,000, respectively. St. Botolph claimed bases of $8,467,000 and $15,867,000 in this stock. This resulted in losses of $8,400,000 and $15,820,000 on the sale of Telcel Equity and Theodor Tower, Inc. stock, respectively. This resulted in a net long-term loss of $3,322,509.

Sixty-Five Bedford filed its Form 1120 for tax year 2001 on September 9, 2002, reporting total gain of $$5,195,474 on the sale of land. Sixty-Five Bedford sold U.S. Treasury bills during 2001. These Treasury bills had been contributed by Fortrend. Sixty-Five Bedford reported a sale price of $14,735 and a basis of $5,185,210 in the Treasury bills. This resulted in a loss on the sale of $5,170,475. Sixty-Five Bedford reported a long-term capital gain of $24,999.

Fortrend distributed to itself the proceeds of the asset sales, taking as profit the difference between those amounts and the amounts it paid for the stock.

Respondent examined the corporations' Federal tax returns. After examination the corporations and respondent entered into closing agreements memorializing the agreed-upon changes to the corporations' returns. The Town Taxi, Checker Taxi, and St. Botolph closing agreements were fully executed on August 1, 2005. The Sixty-Five Bedford closing agreement was fully executed on January 26, 2006.

The closing agreement for Town Taxi provided in pertinent part that Town Taxi recognized an additional $1,925,100 on the sale of the taxicab medallions. The closing agreement also provided that Town Taxi did not recognize any of the claimed $18,495,188 loss on the sale of Trex Communications stock. The closing agreement imposed a 40-percent accuracy-related penalty under section 6662 on the portion of the underpayment attributable to the disallowed loss and a 20-percent accuracy-related penalty on a portion of the increased gain on the sale of the taxicab medallions.

The closing agreement for Checker Taxi provided in pertinent part that Checker Taxi was not entitled to any of the claimed losses of $3,766,154 and $13,097,812 on the sale of Paclaco Equities, Inc. and Trex Communications stock, respectively. The closing agreement also imposed a 40-percent accuracy-related penalty on a portion of the disallowed losses.

The closing agreement for St. Botolph provided in pertinent part that St. Botolph was not entitled to any of the claimed losses of $8,400,000 and $15,820,000 on the sale of Telcel Equity and Theodor Tower, Inc. stock, respectively. The closing agreement also imposed a 40-percent accuracy-related penalty on a portion of the disallowed losses.

The closing agreement for Sixty-Five Bedford provided in pertinent part that Sixty-Five Bedford was not entitled to any of

the claimed loss of $5,170,475 on the sale of U.S. Treasury Bills. The closing agreement also imposed a 40-percent accuracy-related penalty on a portion of the disallowed loss.

The closing agreements set forth the following liabilities:

| Entity | Year | Tax | Penalty Sec. 6662 |
|--------|------|-----|-------------------|
| Town Taxi | 2000 | $6,100,159 | $1,145,027 |
| Checker Taxi | 2000 | 5,722,441 | 1,142,019 |
| St. Botolph | 2001 | 6,839,682 | 1,367,936 |
| Sixty-Five Bedford | 2001 | 1,644,315 | 328,863 |

Respondent was unable to collect against the corporations because they were insolvent at the time the closing agreements were entered into and the taxes and penalties were assessed. On December 8, 2006, respondent issued four statutory notices of liability to the trust (notices of transferee liability) determining that the trust is liable as transferee for the unpaid Federal income tax liabilities and penalties of the corporations set out in the table above.

On March 7, 2007, the trust filed a petition contesting respondent's determination that it was liable as transferee. On April 11, 2008, the trust filed its motion for summary judgment. On May 19, 2008, respondent filed his objection, and on June 26, 2008, the trust filed a reply to respondent's objection.

## Discussion

I. Summary Judgment

Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials. Fla. Peach Corp. v. Commissioner, 90 T.C. 678, 681 (1988). The Court may grant summary judgment where there is no genuine issue of material fact and a decision may be rendered as a matter of law. Rule 121(a) and (b); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994). The moving party bears the burden of proving that there is no genuine issue of material fact, and the Court will draw any factual inferences in the light most favorable to the nonmoving party. Dahlstrom v. Commissioner, 85 T.C. 812, 821 (1985). Rule 121(d) provides that where a party properly makes and supports a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of such party's pleading" but must set forth specific facts, by affidavits or otherwise "showing that there is a genuine issue for trial."

The parties agree that there are no material facts in dispute. Barring stipulation to the contrary, the venue for appeal would appear to be the Court of Appeals for the First Circuit. See sec. 7482(b)(1) (flush language) and (2).

II. <u>Res Judicata</u>

Res judicata serves "the dual purpose of protecting litigants from the burden of relitigating an identical issue and of promoting judicial economy by preventing unnecessary or redundant litigation." <u>Meier v. Commissioner</u>, 91 T.C. 273, 282 (1988). Under the doctrine of res judicata, when a court of competent jurisdiction enters a final judgment on the merits of a cause of action, the parties to the action are bound "'not only as to every matter which was offered and received * * * but as to any other admissible matter which might have been offered for that purpose.'" <u>Commissioner v. Sunnen</u>, 333 U.S. 591, 597 (1948) (quoting <u>Cromwell v. County of Sac</u>, 94 U.S. 351, 352 (1877)); see also <u>Aunyx Corp. v. Canon U.S.A., Inc.</u>, 978 F.2d 3, 6 (1st Cir. 1992) ("The doctrine of <u>res judicata</u> bars all parties and their privies from relitigating issues which were raised or <u>could have been raised</u> in a previous action, once a court has entered a final judgment on the merits in the previous action.").

The essential elements of res judicata are: (1) A final judgment on the merits in an earlier action; (2) an identity of parties or privies in the two suits; and (3) an identity of the cause of action in the earlier and later suits. <u>Hambrick v. Commissioner</u>, 118 T.C. 348, 351 (2002); see also <u>Commissioner v. Sunnen</u>, <u>supra</u> at 597; <u>Aunyx Corp. v. Canon U.S.A., Inc.</u>, <u>supra</u> at 6; <u>Sands v. Commissioner</u>, T.C. Memo. 1997-146, affd. without

published opinion sub nom. Murphy v. Commissioner, 164 F.3d 618 (2d Cir. 1998). The parties agree that the first and second elements are met. The entry of decisions in the trust's deficiency cases was a final judgment on the merits, and the parties are identical. The parties dispute the third element.

For purposes of determining whether two proceedings share the same cause of action, 1 Restatement, Judgments 2d, sec. 24 (1982), states:

> (1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar * * * , the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.
>
> (2) What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

See Manego v. Orleans Bd. of Trade, 773 F.2d 1, 5 (1st Cir. 1985); see also Aunyx Corp. v. Canon U.S.A., Inc., supra at 6-7 (quoting 1 Restatement, supra sec. 24); Hemmings v. Commissioner, 104 T.C. 221, 231-232 (1995).

Applying the transactional approach, identity between causes of action will be found if "both sets of claims--those asserted in the earlier action and those asserted in the subsequent

action--derive from a common nucleus of operative facts." Gonzalez v. Banco Cent. Corp., 27 F.3d 751, 755 (1st Cir. 1994). Even if both claims derive from a common nucleus of operative facts, however, res judicata will not bar a subsequent claim not available during the earlier action. See In re Newport Harbor Associates, 589 F.2d 20, 24 (1st Cir. 1978).

Section 6901(a)(1) authorizes the assessment of transferee liability in the same manner as in the case of the taxes in respect of which the liability was incurred. It does not create a new liability but merely provides a remedy for enforcing the existing liability of the transferor. Coca-Cola Bottling Co. v. Commissioner, 334 F.2d 875, 877 (9th Cir. 1964), affg. 37 T.C. 1006 (1962); Mysse v. Commissioner, 57 T.C. 680, 700-701 (1972). Section 6902 provides that the Commissioner has the burden of proving the taxpayer's liability as a transferee but not that of proving that the transferor was liable for the tax.

The existence and extent of transferee liability is determined under State law. Massachusetts adopted the Uniform Fraudulent Transfer Act (UFTA), Mass. Ann. Laws ch. 109A (Lexis Nexis 2005), effective October 6, 1996. Respondent alleges that the trust violated UFTA. Respondent's position is that the deemed transfers from the corporations to the trust were both actual and constructive fraud under UFTA.

A. The Trust's Arguments

The trust argues that res judicata bars respondent's attempts to collect the corporations' tax liabilities from the trust as a transferee. The trust contends that the liabilities asserted in both the notices of deficiency and the notices of transferee liability arise out of the following transactions and factual events: (1) The asset sales by the corporation, which resulted in substantial long-term gains; (2) the stock sales; and (3) the failure of the corporations to pay the taxes attributable to the asset sales. The trust argues that the deficiency proceedings and the instant proceeding are closely related in time, space, origin, and motivation.

The trust argues that the deficiency action and the instant action are related in time and space because the cause of action underlying both is the same--the corporations' failures to pay taxes. The trust contends that respondent made a tactical decision to attempt to collect the corporations' unpaid tax liabilities by issuing the notices to the trust that gave rise to the deficiency cases.

The trust argues that the deficiency cases and the instant action have the same origin because both arise out of the same transactions and the failure of the corporations to pay their tax liabilities. The trust contends that the fact that the deficiency cases arose out of an examination of the trust's tax

returns and the instant action arises out of an attempt to collect the unpaid tax of the corporations does not negate the fact that the origins of both are the same underlying transactions.

The trust argues that the motivation behind the deficiency cases and the instant case is the same--to hold the trust liable for the unpaid tax liabilities of the corporations. The trust points to respondent's characterization of the asset sales and the stock sales as parts of a prearranged "intermediary transaction" of the kind described in Notice 2001-16, 2001-1 C.B. 730, as support for this argument. The trust points to respondent's determination of penalties in the deficiency cases as further evidence that both actions share the same motivation. The trust also quotes a sentence in the explanation of items attached to the notices of deficiency: "the intermediary entity served no legitimate business purpose and was nothing more than a diversion to avoid paying corporate income tax."

The trust further argues that the facts underlying the two actions would form a convenient trial unit, that the underlying injury in both actions is the same, and that both actions rest on the same cause of action and identical factual bases.

The trust argues that both the deficiency cases and the instant action arise because the corporations failed to pay taxes on income earned by the corporations on the asset sales. The

trust contends that the unpaid tax liabilities of the corporations were the underlying cause of both the deficiency cases and the instant action.  The trust again points to respondent's characterization of the stock sales as "intermediary transactions" described in Notice 2001-16, supra, and argues that this supports the conclusion that the corporate taxes were at issue in the deficiency cases.

The trust contends that although the earlier cases involved notices of deficiency increasing the trust's tax liabilities and the instant cases involve collection of the corporations' unpaid tax liabilities, both arose because, following respondent's theory that the corporations transferred property (cash) to the trust in a deemed liquidation of the corporations, the corporations failed to pay taxes on the gain from the asset sale. The trust contends that both the deficiency cases and the instant action rely upon respondent's theory of constructive liquidations.

B.  Respondent's Arguments and the Trust's Rejoinder

Respondent disputes the trust's contentions and argues that res judicata does not bar the instant action.  Respondent argues that the causes of action are not identical, contending that the notices of deficiency concerned deficiencies in the trust's fiduciary income tax arising from the sale of stock, while the

notices of liability concern a collection action for the corporations' assessed but unpaid tax liabilities.

Respondent further disagrees that the operative facts of the two cases are related in time, space, origin, and motivation. Respondent argues that the two cases differ in time and space because the deficiency cases involved the trust's 2000 and 2001 tax deficiencies, specifically whether the trust reported the appropriate amounts of capital gains on its returns, while the instant case involves the collection of the corporations' tax liabilities.

Respondent contends that the deficiency cases originated in an examination of the trust's 2000 and 2001 income tax returns while the instant action originates from the examination of the corporations' 2000 and 2001 income tax returns.

Respondent argues that the motivation behind the deficiency cases was to determine the correct amounts of income tax due from the trust for 2000 and 2001, while the motivation behind the instant action is to collect from the trust as transferee the unpaid tax liabilities of the corporations.

Respondent argues that the deficiency cases and the instant action would not form a convenient trial unit because respondent was unable to raise transferee liability during the deficiency cases. Respondent contends that the requirements of section 6901 prevented him from asserting the transferee liability claim

during the pendency of the deficiency cases. Respondent further argues that the trust's deficiency cases and the transferee liability case could not be consolidated because the trust's transferee liability case was not docketed with this Court until after the deficiency cases were closed. The deficiency cases were resolved on February 14, 2006, before the transferee case was docketed on March 7, 2007.

The trust disputes respondent's contention that transferee liability could not be at issue in the deficiency cases. The trust contends that respondent made a tactical decision not to raise transferee liability during the deficiency cases or to have the deficiency cases joined with the instant action.

The trust further contends that respondent's characterizing the deficiency cases as so-called intermediary transactions shows his awareness that the corporate tax was at issue in those proceedings. The trust relies on Aunyx Corp. v. Canon U.S.A., Inc., 978 F.2d 3 (1st Cir. 1992), and argues that respondent knew enough about the facts of the transactions to have issued a notice of transferee liability rather than the notices of deficiency. The trust further contends that respondent could have asserted transferee liability during the deficiency cases, rather than letting the deficiency cases close and "trying to get a second bite at the apple".

C.  Conclusion

We agree with respondent that res judicata does not bar the instant action.  The cause of action in the deficiency cases is not the same as that in the instant action.  The deficiency cases dealt with the trust's gain on the sale of its stock in the corporations.  The issue to be determined was the trust's fiduciary income tax liability.  Had respondent's determinations in the notices of deficiency been upheld, the trust would have paid more tax on the sale of the corporations' stock.  However, that determination would not have required the trust to pay the unpaid tax liabilities of the corporations.

The instant action deals with the trust's liability as transferee for the unpaid tax liabilities of the corporations.  The trust's liability as transferee is not the same as the trust's fiduciary tax liability.  The corporations' tax liabilities arose from the disallowance of the claimed losses and the corporations' entering into closing agreements with the IRS.  Because the corporations held no assets, respondent was forced to attempt to collect the unpaid tax from the trust.

The trust's contention that a statement in the notice of deficiency shows respondent's intention to collect the corporations' tax by issuing the notices of deficiency is misplaced.  The notices of deficiency stated that the intermediary entity served no purpose other than to avoid paying

corporate tax.  This avoidance of corporate tax, however, does not mean that the notice was an attempt by respondent to collect that unpaid corporate tax.

The time, space, origin, and motivation of the deficiency cases and the instant action differ.  It is a longstanding principle that the Commissioner can collect the unpaid tax liabilities of a corporation from transferee shareholders.  See Phillips v. Commissioner, 283 U.S. 589 (1931); Shepard v. Commissioner, 101 F.2d 595 (7th Cir. 1939), affg. 36 B.T.A. 268 (1937); Hunn v. United States, 60 F.2d 430 (8th Cir. 1932); McDonald v. Commissioner, 52 F.2d 920 (4th Cir. 1931), revg. 18 B.T.A. 800 (1930); Humbert v. Commissioner, 24 B.T.A. 828 (1931); Gideon-Anderson Co. v. Commissioner, 20 B.T.A. 106 (1930); Castorina v. Commissioner, T.C. Memo. 1986-540; Fugate v. Commissioner, T.C. Memo. 1977-18.  The Commissioner likewise can determine a deficiency against a taxpayer by adjusting the taxpayer's claimed basis in stock.  See Coloman v. Commissioner, 540 F.2d 427 (9th Cir. 1976), affg. T.C. Memo. 1974-78; Gleason v. Commissioner, T.C. Memo. 2006-191; Arnold v. Commissioner, T.C. Memo. 2003-259.

Res judicata does not bar the Commissioner from:  (1) Issuing a notice of deficiency to a taxpayer determining a deficiency; and (2) issuing a notice of transferee liability to a taxpayer in an attempt to collect from the taxpayer the unpaid

tax of another.  See <u>Milk Bottle Exchange, Inc. v. Commissioner</u>, 43 B.T.A. 33, 34-36 (1940); see also <u>S-K Liquidating Co. v. Commissioner</u>, 64 T.C. 713 (1975) (allowing issuance of a second notice of deficiency because the two notices were based upon two separate returns covering different taxable periods, and the determined deficiencies originated from taxes enacted for different purposes).

Although the deficiency cases and the instant action arise out of similar facts, there is no identity between the causes of action, and the third element required for res judicata to apply has not been met.  See <u>Enos v. Commissioner</u>, 123 T.C. 284, 303-304 (2004); <u>Milk Bottle Exchange, Inc. v. Commissioner</u>, <u>supra</u> at 34-36.  Res judicata does not bar respondent's attempts to collect the corporations' tax liabilities in this transferee proceeding.

Further, even if we were to agree with the trust that the cause of action in the deficiency cases arose from the same common nucleus of operative facts as the instant action, 1 Restatement, <u>supra</u> sec. 26, provides an exception to 1 Restatement, <u>supra</u> sec. 24, that allows respondent to assert transferee liability against the trust:  the general rule of section 24 does not apply to bar a claim for relief if there was a jurisdictional barrier or limit on the authority of the tribunal hearing the first action that did not allow the

plaintiff to put forward that claim for relief.  Respondent could not assert transferee liability in the deficiency cases because the trust's fiduciary tax liabilities and the trust's liability as transferee could not be litigated in one proceeding.  See <u>Milk Bottle Exchange, Inc. v. Commissioner</u>, <u>supra</u> at 36; <u>Locke v. Commissioner</u>, T.C. Memo. 1996-541, affd. without published opinion 152 F.3d 927 (9th Cir. 1998).

Although the deficiency cases and the instant action share some of the same facts, respondent could not raise transferee liability in the deficiency cases because the two proceedings present two distinct causes of action.  Therefore res judicata does not bar respondent's attempts to collect the corporations' unpaid tax liabilities from the trust.

III.  <u>Collateral Estoppel</u>

The trust argues in the alternative that respondent is collaterally estopped from arguing in this case that the stock sales were in substance deemed liquidating distributions from the corporations to the trust.

Collateral estoppel has the "dual purpose of protecting litigants from the burden of relitigating an identical issue and of promoting judicial economy by preventing unnecessary or redundant litigation."  <u>Meier v. Commissioner</u>, 91 T.C. at 282; see also <u>Montana v. United States</u>, 440 U.S. 147, 153-154 (1979); <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322, 326 (1979).  In

general, the doctrine of collateral estoppel forecloses relitigation of issues actually litigated and necessarily decided in a prior suit. Parklane Hosiery Co. v. Shore, supra at 326 n.5; Meier v. Commissioner, supra at 282; Peck v. Commissioner, 90 T.C. 162, 166 (1988), affd. 904 F.2d 525 (9th Cir. 1990).

This Court has set forth five prerequisites necessary for the application in factual contexts of collateral estoppel:

> (1) The issue in the second suit must be identical in all respects with the one decided in the first suit.

> (2) There must be a final judgment rendered by a court of competent jurisdiction.

> (3) Collateral estoppel may be invoked against parties and their privies to the prior judgment.

> (4) The parties must actually have litigated the issues and the resolution of these issues must have been essential to the prior decision.

> (5) The controlling facts and applicable legal rules must remain unchanged from those in the prior litigation.

Peck v. Commissioner, supra at 166-167 (citations omitted). The trust focuses on the fourth element--that the parties must have actually litigated the issues and the resolution of the issue must have been essential to the prior decision. The trust concedes that there was no trial during the deficiency cases but argues that the parties' pleadings put in issue whether the trust was the recipient of liquidating distributions from the corporations. The trust points to Klingman v. Levinson, 831 F.2d 1292, 1296 (7th Cir. 1987), arguing that collateral estoppel can

apply to issues not litigated if the parties to the first proceeding could reasonably have foreseen the conclusive effect of their actions.

The trust contends that respondent's theory in the deficiency cases was that there were deemed liquidating distributions. Because respondent conceded that there were no deficiencies in tax, the trust argues that respondent implicitly conceded that there could not have been liquidating distributions. Therefore the trust cannot be liable as transferee because there were no transfers of property from the corporations to the trust.

Respondent argues that collateral estoppel is inapplicable because the issues underlying the trust's potential transferee liability were not actually litigated or necessarily decided in the deficiency cases. Respondent argues that the exception in Klingman v. Levinson, supra, does not apply because the trust and respondent did not agree to any stipulations in the deficiency cases other than what appears in the decision documents, and those stipulations, as embodied in the final decisions, do not concede that the stock sales should be respected for Federal tax purposes, that the trust received no distributions from the corporations, or that the trust was not liable as transferee. Respondent concludes that there is no basis to read the

stipulated decisions as a concession that the sales of stock were reported properly or that the trust is not liable as transferee.

In Klingman v. Levinson, supra, the Court of Appeals for the Seventh Circuit was asked to decide whether a judgment obtained by Ms. Klingman against Mr. Levinson was dischargeable in bankruptcy. Ms. Klingman and Mr. Levinson entered into a trust agreement with Mr. Levinson as trustee. Id. at 1293. Later, Ms. Klingman filed suit against Mr. Levinson in State court alleging dissipation of trust assets. Id. The action was resolved by consent judgment, and pursuant to that judgment Mr. Levinson was to pay Ms. Klingman $37,550 plus interest and $10,000 of attorney's fees. Id. The parties stipulated a number of facts in the consent judgment, including that Mr. Levinson allowed or caused the dissipation and loss of the trust corpus and that Mr. Levinson's obligation to Ms. Klingman was not to be dischargeable in any bankruptcy or similar proceeding filed by Mr. Levinson. Id. The stipulation also indicated that if there were to be any further proceedings, the facts included in the consent judgment would be taken as true. Id. Mr. Levinson later filed for bankruptcy. Id. Ms. Klingman filed a response claiming that her judgment against Mr. Levinson was not dischargeable under bankruptcy laws because it resulted from fraud by Mr. Levinson. Id. The bankruptcy court granted Ms. Klingman's motion for summary judgment and held in part that Mr. Levinson was barred

from relitigating the issue of defalcation because he had stipulated the finding (contained in the consent judgment) that he had violated his fiduciary duties by defalcating assets of the trust.  Id. at 1294.  The District Court affirmed the bankruptcy court's order.  Id.

The Court of Appeals for the Seventh Circuit affirmed the decisions of the bankruptcy court and the District Court.  The Court of Appeals first had to determine whether a State court judgment was entitled to any weight in determining whether collateral estoppel applied in a Federal proceeding.  Klingman v. Levinson, supra at 1295.  The Court of Appeals answered in the affirmative, stating that "Where a state court determines factual questions using the same standards as the bankruptcy court would use, collateral estoppel should be applied to promote judicial economy by encouraging the parties to present their strongest arguments."  Id.  The Court of Appeals then applied the doctrine to the facts of the case.  After laying out the four factors required for collateral estoppel to apply, the court focused on the requirement that the issue be "actually litigated".  Id. at 1296.  The Court of Appeals, quoting Kaspar Wire Works, Inc. v. Leco Engg. & Mach., Inc., 575 F.2d 530, 539 (5th Cir. 1978), stated that "if the parties to a consent decree 'indicated clearly the intention that the decree to be entered shall not only terminate the litigation of claims but, also, determine

finally certain issues, then their intention should be effectuated.'" Id.

Applying that rule to the case before it, the Court of Appeals held that collateral estoppel applied to bar Mr. Levinson from challenging the facts in the consent decree because it "is certainly reasonable to conclude that the parties understood the conclusive effect of their stipulation in a future bankruptcy proceeding." Id.

We agree with respondent that he is not collaterally estopped from arguing in this proceeding that there were deemed liquidating distributions from the corporations to the trust. The deficiency cases and the instant action concern different liabilities. The deficiency cases concerned the trust's fiduciary tax liabilities while the instant case concerns the trust's liability as transferee. The notices of deficiency laid out alternative grounds for respondent's adjustments: (1) An adjustment to the trust's claimed bases in the stock; or (2) an increase in the amounts received as the result of liquidating distributions. The decision documents, however, do not mention either alternative, let alone stipulate that respondent was conceding on either or both theories.

As the Supreme Court stated in United States v. Intl. Bldg. Co., 345 U.S. 502, 506 (1953), in denying the application of the principle of collateral estoppel to a later proceeding in this

Court after the parties entered into a compromise in an earlier proceeding:

> A judgment entered with the consent of the parties may involve a determination of questions of fact and law by the court.  But unless a showing is made that that was the case, the judgment has no greater dignity, so far as collateral estoppel is concerned, than any judgment entered only as a compromise of the parties.

See also Apparel Art Intl., Inc. v. Amertex Enters. Ltd., 48 F.3d 576, 583 n.9 (1st Cir. 1995) ("Although Apparel's allegations of fraudulent conveyance were raised in Apparel II and dismissed by the district court, neither factual determinations nor conclusions as to the legal merit of these claims were made by the trial court.").

In United States v. Intl. Bldg. Co., supra, the Court was unable to tell whether the agreement of the parties was based upon the merits or on some collateral consideration.  See also Massaglia v. Commissioner, 33 T.C. 379, 386 (1959), affd. 286 F.2d 258 (10th Cir. 1961), in which we stated:  "A decision by this Court, entered upon a stipulation of deficiencies, without a hearing on the merits, is not a decision on the merits such as will support a plea of collateral estoppel".  See also Estate of Cavett v. Commissioner, T.C. Memo. 2000-91.

Respondent's decision to concede the deficiency cases could have been based on any number of considerations.  We cannot determine, on the basis of the parties' stipulations, why respondent conceded those cases.  Because the question whether

there were liquidating distributions was not actually litigated, nor was it essential to the decisions in the deficiency actions, collateral estoppel does not bar respondent from asserting in the instant action that there were liquidating distributions from the corporations to the trust.

The exception in <u>Klingman v. Levinson</u>, 831 F.2d 1292 (7th Cir. 1987), does not apply.  The stipulated decisions do not include stipulations of the type present in <u>Klingman v. Levinson</u>, <u>supra</u>, where Mr. Levinson attempted to argue that his debt was dischargeable even though he had stipulated the contrary.  The decision documents in the deficiency cases do not identify the basis underlying respondent's concession.  It would be unreasonable to read those decision documents as a concession by respondent that the stock sales were to be respected or that the trust was not a transferee.

Because the issue of whether there were liquidating distributions was not actually litigated in the deficiency cases, respondent is not collaterally estopped from arguing in the instant transferee liability action that there were liquidating distributions.

IV.  <u>Conclusion</u>

Because res judicata and collateral estoppel do not bar the instant action, the trust's motion will be denied.

To reflect the foregoing,

<u>An appropriate order</u>

<u>denying the trust's motion</u>

<u>will be issued</u>.