T.C. Memo. 2014-59

UNITED STATES TAX COURT

FRANK SAWYER TRUST OF MAY 1992, TRANSFEREE,
CAROL S. PARKS, TRUSTEE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

Docket No. 5526-07.                          Filed April 3, 2014.

David R. Andelman and Juliette M. Galicia, for petitioner.

Kevin G. Croke and Yvonne M. Walker, for respondent.

SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge: This matter is before the Court on remand from the Court

of Appeals for the First Circuit for further proceedings in accordance with its

———————————

[*]This Opinion supplements our previously filed opinion Frank Sawyer Trust of May 1992 v. Commissioner, T.C. Memo. 2011-298, rev'd and remanded, 712 F.3d 597 (1st Cir. 2013).

**[*2]** opinion in <u>Frank Sawyer Trust of May 1992 v. Commissioner</u>, 712 F.3d 597 (1st Cir. 2013), <u>rev'g and remanding</u> T.C. Memo. 2011-298 (<u>Frank Sawyer II</u>).[1] The issue for decision on remand is whether Frank Sawyer Trust of May 1992 (the Trust) is liable as a transferee of a transferee under section 6901.[2] We hold that it is; however, we conclude that the Trust is a good-faith transferee and, therefore, is not liable to the full extent stated in the notices of liability.

## FINDINGS OF FACT

We summarize relevant background from <u>Frank Sawyer II</u> and set forth additional facts for purposes of deciding the issue on remand.[3]

This case involves respondent's efforts to collect tax and penalties assessed upon four C corporations. The corporations acknowledge that they owe the Federal Government a combined total of more than $24.3 million in tax and penalties. However, they have no money to pay. The Trust owned the

---

[1]Consistent with the mandate, we call this opinion <u>Frank Sawyer II</u> and note the existence of <u>Frank Sawyer I</u>, <u>Frank Sawyer Trust of May 1992 v. Commissioner</u>, 133 T.C. 60 (2009), which is not discussed herein.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]We afforded the Trust an opportunity to supplement the record on remand, but it declined.

[*3] corporations when they generated large capital gains, but it sold the corporations before the tax on the gains came due. The purchasing companies stripped the assets from the corporations before respondent could collect, and respondent now seeks to recover the tax and penalties from the Trust. The issue for decision is whether the Trust is liable to the IRS for the corporations' unpaid tax and penalties.

The Trust held 100 % of the stock of the four C corporations--two taxi corporations and two real estate corporations.[4] Carol S. Parks, as trustee, decided to sell the stock of the corporations to Fortrend International, LLC (Fortrend). The stock sale involved two steps. First, the corporations liquidated their assets and satisfied all of their nontax liabilities, leaving the corporations with nothing but cash and tax liabilities. Second, the Trust sold all of its stock in the corporations to various acquisition corporations Fortrend had formed (Fortrend acquisition vehicles).[5]

---

[4]The four C corporations are as follows: (1) TDGH, Inc.; (2) CDGH, Inc.; (3) St. Botolph Holding Co.; and (4) Sixty-Five Bedford Street, Inc.

[5]The term "Fortrend acquisition vehicles" refers collectively to Three Wood, Baritone, Tremolo, Monte Mar, and SWRR unless otherwise noted. Fortrend controlled the acquisition vehicles.

[*4]  Fortrend offered to pay a price equal to the value of the companies' assets (which by that point consisted only of cash) minus a percentage of the value of the companies' Federal and State tax liabilities.  Fortrend financed the acquisition of the two taxi corporations with a $30 million loan from Rabobank and a contribution of about $2.7 million from one of its controlled entities.  At the time of the stock sale, the two taxi corporations were solvent.  They had about $39.6 million in cash and about $14.3 million of contingent income tax liabilities.  Fortrend paid the Trust more than $32.4 million for the taxi corporations, whose net book value was approximately $25.3 million.  Before yearend, Fortrend repaid its Rabobank loan and caused the taxi corporations to make numerous transfers that ultimately left them with yearend cash balances of roughly $300,000 and $90,000, respectively; their income tax liabilities remained at about $14.3 million.

Fortrend financed the stock purchase of one of the real estate corporations with a $19 million loan from Rabobank.  Fortrend financed the stock purchase of the other real estate corporation with a cash loan of approximately $4.9 million from one of its controlled entities.  At the time of the respective stock sales, the two real estate corporations were solvent.  They had cash of about $27.5 million and contingent income tax liabilities of about $10.5 million.  In total, Fortrend paid the Trust about $23.4 million for the real estate corporations, which had

[*5] combined net values of only about $16.9 million. Before yearend, Fortrend repaid its loans and caused the real estate corporations to make numerous transfers that ultimately left them with yearend cash balances of roughly $300,000 each; their combined income tax liabilities remained at $10.5 million.

Although Fortrend agreed to assume the tax liabilities of each of the four companies, it planned to avoid paying the tax with a common tax shelter. In a subsequent examination of the four companies' returns, the IRS disallowed loss deductions the shelter generated. The companies ultimately conceded that they owed a combined $20.3 million in tax and nearly $4 million in penalties.

Meanwhile, the Trust reported no tax liability on its sale of the taxi corporations and an aggregate long-term capital gain of approximately $14.4 million on the sale of the real estate corporations. Initially, the IRS disputed the Trust's capital gains tax liabilities, but pursuant to an out-of-court agreement between the parties, this Court held that the Trust was not liable for deficiencies or penalties with respect to their 2000 and 2001 returns.

The parties' agreement did not resolve whether the Trust is liable as a transferee of a transferee for the deficiencies and penalties assessed on the four

**[*6]** C corporations. Relying on Massachusetts fraudulent transfer law,[6] we held in <u>Frank Sawyer II</u> that the Trust was not liable as a transferee under section 6901 for the corporations' taxes and penalties for two reasons: (1) the IRS failed to prove that the Trust knew of the new shareholders' asset-stripping scheme, and (2) the IRS failed to prove that any of the corporations' assets were transferred directly to the Trust.

The Court of Appeals affirmed our holding that the Trust lacked actual or constructive knowledge of the new shareholders' tax-avoidance intentions. However, it remanded the case for us to determine (1) whether, at the time of purchase, the Fortrend acquisition vehicles received reasonably equivalent value in exchange for the purchase prices of the four corporations, and (2) whether the Fortrend acquisition vehicles' inability to satisfy the tax liabilities was reasonably foreseeable.

OPINION

After the Court of Appeals issued the mandate, we ordered the parties to state their respective positions regarding the issue on remand, and both parties

---

[6]Massachusetts has adopted the Uniform Fraudulent Transfer Act. Mass. Ann. Laws ch. 109A, secs. 1-12 (LexisNexis 2005); <u>Fed. Refinance Co. v. Klock</u>, 352 F.3d 16, 23 n.2 (1st Cir. 2003).

**[\*7]** complied. There being no need for trial or further hearing, we review the

parties' respective positions in the light of the Court of Appeals' opinion.

I.     Jurisdiction

Petitioner argues that for two reasons we do not have jurisdiction to

consider whether the Trust received a fraudulent transfer from the Fortrend

acquisition vehicles. First, respondent failed to issue transferee-liability notices to

petitioner based upon transferee-of-transferee liability, and respondent is now time

barred from doing so. Second, respondent made no timely transferee-liability

assessments against the Fortrend acquisition vehicles, as initial transferees, and

again is time barred from doing so. Given the procedural posture of this case, we

find petitioner's objections reasonable; however, we believe our jurisdiction over

this issue is implicit in the mandate.[7]

The Court of Appeals acknowledged that the transferee-of-transferee-

liability theory is not identical to the transferee-liability theory adopted by

---

[7]The rule of mandate is a branch of the law of the case doctrine. United States v. Matthews, 643 F.3d 9, 13 (1st Cir. 2011). The rule prevents relitigating matters in the trial court that were explicitly or implicitly decided by an earlier appellate decision in the same case. United States v. Moran, 393 F.3d 1, 7 (1st Cir. 2004). "'When a case is appealed and remanded, the decision of the appellate court establishes the law of the case and it must be followed by the trial court on remand.'" United States v. Rivera-Martinez, 931 F.2d 148, 150 (1st Cir. 1991) (quoting 1B J. Moore, J. Lucas, & T. Currier, Moore's Federal Practice, para. 0.404[1] (2d ed. 1991)).

[*8] respondent in his arguments before this Court and the Court of Appeals. However, the mandate explicitly states that "there is no waiver" and that the Government preserved its claims and placed in the record substantial evidence to support a transferee-of-transferee liability theory. Frank Sawyer Trust of May 1992 v. Commissioner, 712 F.3d at 599, 612.

Petitioner also argues that the Court of Appeals relied on language it took out of context from Mertens Law of Federal Income Taxation and Bos Lines, Inc. v. Commissioner, T.C. Memo. 1965-71, aff'd, 354 F.2d 830 (8th Cir. 1965), in finding that respondent's failure to issue a notice of transferee-of-transferee liability was immaterial.[8]  However, we need not address this argument because petitioner's argument is inconsistent with the mandate.

---

[8]In a footnote, the Court of Appeals stated:  "When the IRS seeks to collect taxes from a transferee of a transferee (rather than a direct transferee), 'it is not required to specifically label the asserted liability as being that of a transferee or of a transferee of a transferee nor to evaluate its legal effect.'"  Frank Sawyer Trust of May 1992 v. Commissioner, 712 F.3d 597, 612 n.5 (1st Cir. 2013) (quoting 14A Mertens Law of Federal Income Taxation sec. 53:24, at 53-68).  In Bos Lines, Inc. v. Commissioner, T.C. Memo. 1965-71, 1965 Tax Ct. Memo. LEXIS 259, at *31, aff'd, 354 F.2d 830 (8th Cir. 1965), we also said:  "This identification may be necessary if and when the additional one-year period of the statute of limitations in the case of a second transfer is involved".  Because the mandate implicitly decides we have jurisdiction, we need not address the wisdom in Bos Lines.

**[*9]** II.     Transferee-of-Transferee Liability

The Court of Appeals affirmed our holding that the Trust was not liable as a transferee under the Massachusetts Uniform Fraudulent Transfer Act (MUFTA), Mass. Ann. Laws ch. 109A, secs. 1-12 (LexisNexis 2005).  However, the mandate states that "the Trust is quite clearly 'a transferee of a transferee' of each of the four companies", and the Trust may still have transferee-of-transferee liability under MUFTA.  Frank Sawyer Trust of May 1992 v. Commissioner, 712 F.3d at 610.

First, we address respondent's ability to collect from the Trust as a transferee of a transferee.  Respondent can collect from the Trust only if it was a "creditor" of the Fortrend acquisition vehicles.  Id. at 607 (citing Mass. Ann. Laws ch. 109A, secs. 5(a), 6).  The mandate states:  "The fraudulent transfer from the compan[ies] to the Fortrend entit[ies] made the IRS a creditor of the latter, and as the Fortrend entit[ies]'s creditor, the IRS can recover from the Trust provided that the Trust received a fraudulent transfer from the Fortrend entit[ies]."  Id. at 611.  Therefore, we must determine whether the Trust received a fraudulent transfer from the Fortrend acquisition vehicles.

Under MUFTA, we apply a two-pronged test to determine whether a corporate transfer is fraudulent.  Mass. Ann. Laws ch. 109A, sec. 5(a)(2).  A

**[\*10]** corporate transfer is fraudulent if it meets two statutory criteria: (1) the corporation (i.e., Fortrend) did not receive a reasonably equivalent value in exchange for the transfer and (2) the corporation either (i) was engaged or was about to engage in a business or transaction for which the remaining assets were unreasonably small, or (ii) intended to incur, believed, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due. Id.

### A.  Taxi Corporations Sale

Three Wood purchased two taxi corporations from the Trust for $32.4 million. We evaluate each prong of the two-pronged test below.

#### 1.  Prong 1

The first prong concerns the value each party to the transaction received. We must determine whether those values were "reasonably equivalent". To make this determination, we compare the values of the property the parties exchanged; we do not require an exact exchange, and we consider both direct and indirect benefits. McBirney v. Paine Furniture Co., 2003 Mass. Super. LEXIS 115, at \*25 (Super. Ct. Mar. 31, 2003). In comparing what was exchanged, we keep in mind MUFTA's equitable purposes and recognize that any significant disparity between

**[*11]** the value Three Wood received and the obligation it assumed will have significantly harmed innocent creditors. Id.

The Court of Appeals recognized that Three Wood paid a premium over the taxi companies' book value. Their combined book value (cash assets minus tax liabilities) was roughly $25.3 million, but Three Wood paid about $32.4 million to acquire them. We must determine whether Three Wood anticipated any "synergy"[9] or received any "goodwill"[10] that justified this $7.1 million premium. Alternatively, we must determine whether Three Wood or Fortrend legitimately and reasonably expected that it could avoid paying the taxi companies' tax liabilities. See, e.g., Mellon Bank N.A. v. Metro Commc'ns, Inc., 945 F.2d 635, 647 (3d Cir. 1991) (finding no fraudulent transfer where parties had "legitimate and reasonable expectation" that transaction would prove to be profitable).

Petitioner argues that this premium was not a premium at all. Rather, the purchase price resulted from an arm's-length negotiation and represented the corporations' combined fair market value. Fair market value is the price at which

---

[9]See, e.g., Mellon Bank, N.A. v. Metro Commc'ns, Inc., 945 F.2d 635, 647 (3d Cir. 1991) (analyzing "reasonably equivalent value" for purposes of 11 U.S.C. sec. 548).

[10]See Allstate Ins. Co. v. Countrywide Fin. Corp., 842 F. Supp. 2d 1216, 1224 (C.D. Cal. 2012) (applying Illinois UFTA).

[*12] property would "'change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.'" United States v. Cartwright, 411 U.S. 546, 551 (1973) (quoting section 20.2031-1(b), Estate Tax Regs.). Petitioner contends that $32.4 million represented the taxi corporations' fair market value because Three Wood was a willing buyer offering to pay that amount. We disagree; Three Wood was willing to pay that amount only because it believed it could avoid the corporations' tax liabilities.

The two taxi corporations ceased their operations, terminated all employee contracts, and sold all their assets before the stock sale; all that remained was cash. The Trust even stripped the names from the corporations before sale. Consequently, Three Wood purchased two companies possessing nothing but cash and tax liabilities. Accordingly, we see no reason to attribute the $7.1 million premium to "synergy", "goodwill", or any other going-concern value.

We also hold that Three Wood did not legitimately and reasonably expect its tax avoidance strategy to succeed. Three Wood purchased these companies because they had large tax liabilities, and it planned to make money from the acquisitions by offsetting those liabilities. However, the law is quite clear that

**[*13]** transactions having no business purpose other than avoiding taxes will not be respected. Gregory v. Helvering, 293 U.S. 465, 469-470 (1935).

Fortrend offered to buy the stock of the taxi corporations after the capital-gain-producing asset sales, but it wanted all existing and potential liabilities eliminated except for the contingent Federal and State tax liabilities. The record demonstrates that Fortrend did not intend to maintain the corporations as going concerns. Rather, Fortrend's plan was to borrow enough money to acquire cash-rich corporations saddled with large capital gains, use those corporations' cash to repay the loans, then shift loss deductions from other Fortrend entities into the newly acquired corporations.[11]

Because Three Wood believed it could avoid the tax, it was willing to pay more than fair market value for the corporations. Because it paid more than fair market value, it did not receive reasonably equivalent value when it transferred cash to pay the purchase price. The value ($25.3 million) Three Wood received was not reasonably equivalent to the value ($32.4 million) it transferred. Accordingly, the transfer violated the first prong of MUFTA's fraudulent transfer test.

---

[11]Fortrend caused its subsidiaries to transfer high-basis, low-value assets into the corporations. The corporations sold those built-in loss assets and reported large losses to offset the capital gains.

**[*14]**          2.     Prong 2

The next question under MUFTA is whether Three Wood either (i) was engaged or about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction or (ii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.  See Mass. Ann. Laws ch. 109A, sec. 5(a)(2).

Before Three Wood purchased the taxi companies, its only assets were the $30 million Rabobank loan proceeds and the $2.7 million Fortrend contributed to meet the purchase price.  Three Wood could not repay the loan and pay the $14.3 million in tax liabilities it assumed in the purchase.  Three Wood's solvency depended on its ability to avoid the tax liabilities.  As we discussed above, Three Wood should have known that its tax avoidance strategy would fail.  Consequently, Three Wood should have known that purchasing the taxi companies would cause it to incur debts beyond its ability to pay as they became due.  Accordingly, when Three Wood paid the purchase price to the Trust, it violated the second prong of MUFTA's fraudulent transfer test.

**[*15]** B.    Real Estate Corporations Sale

Monte Mar purchased St. Botolph from the Trust for $18.5 million.  Monte Mar and St. Botolph subsequently merged.  Similarly, SWRR purchased Sixty-Five Bedford for $4.9 million, and those two corporations subsequently merged.  As above, we evaluate these transactions under MUFTA's two-pronged fraudulent-transfer test.

1.    Prong 1

The Court of Appeals recognized that Monte Mar and SWRR paid a premium over the book value of the real estate companies.  The real estate companies' combined book value was roughly $16.9 million, but the Fortrend acquisition vehicles paid about $23.4 million to acquire them.

Because these are real estate corporations and not businesses, we need not consider any synergy or goodwill justification.  For the same reasons we stated above, we believe Fortrend and its entities did not legitimately and reasonably expect their tax avoidance strategy to succeed.  Therefore, we conclude that the Fortrend acquisition vehicles did not receive reasonably equivalent value for their transfers to the Trust.

**[\*16]**      2.    <u>Prong 2</u>

Again under prong 2 we consider whether the Fortrend acquisition vehicles should have reasonably believed that their purchases of the corporations would cause them to incur debts beyond their ability to pay.  The Fortrend acquisition vehicles paid $23.4 million to acquire the real estate corporations.  The corporations had about $27.5 million in cash and $10.5 million in tax liabilities.  Once the Fortrend acquisition vehicles extracted $23.9 million in cash to repay their loans, only about $3.6 million remained to satisfy $10.5 million in tax liabilities.  The Fortrend acquisition vehicles' solvency depended on the success of their tax avoidance strategy.  As we determined above, they should have known that the strategy would fail.  Consequently, they should have known that purchasing the real estate corporations would leave them with liabilities they could not pay.  Accordingly, we conclude the Fortrend acquisition vehicles violated the second prong of MUFTA's fraudulent transfer test when they transferred the purchase prices to the Trust.

In sum, the Trust received fraudulent transfers from the Fortrend acquisition vehicles and, accordingly, is liable as a transferee of a transferee.  We now turn to the amount of the Trust's liability.

**[*17]** III.    Liability Amount

The IRS issued notices of liability to the Trust, stating that it owed $11,822,600 and $8,483,997 in Federal tax for the taxi and real estate corporations, respectively.  However, the parties have stipulated that the acquisition vehicles overpaid book value by only $7,145,047 and $6,350,023, respectively.  The amounts in the notices of liability substantially exceed the excess value the Trust received for the corporations.  Under Massachusetts law, a good-faith transferee is entitled to a judgment liability reduction to the extent of the value it gave the debtor for the transfer.  See Mass. Ann. Laws ch. 109A, sec. 9(d).

As we stated in Frank Sawyer II, we are convinced that the Trust lacked actual or constructive knowledge of the postclosing activities Fortrend had planned.  Consistent with that holding, we believe the Trust acted in good faith.  Accordingly, Massachusetts law limits respondent's recovery to $13,495,070, the amount the Trust received in excess of the corporations' fair value.

IV.    Conclusion

The Trust is liable for the unpaid tax, interest, and penalties of the four C corporations as a transferee of a transferee.  However, because we find the Trust was a good-faith transferee under Massachusetts law, respondent's recovery, apart

**[*18]** from interest and penalties, is limited to the difference between the purchase price and the fair market value of each of the acquired companies. See Frank Sawyer Trust of May 1992 v. Commissioner, 712 F.3d at 611-612.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered under Rule 155.