T.C. Memo. 2011-298

UNITED STATES TAX COURT

FRANK SAWYER TRUST OF MAY 1992, TRANSFEREE, CAROL S. PARKS,
TRUSTEE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5526-07.                    Filed December 27, 2011.

<u>David R. Andelman</u> and <u>Juliette Galicia Pico</u>, for petitioner.

<u>Kevin G. Croke</u> and <u>Yvonne M. Walker</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  In four statutory notices of liability,
respondent determined that the Frank Sawyer Trust of 1992 is
liable as a transferee for the assessed Federal income tax
liabilities, penalties, and interest of four C corporations:  (1)
TDGH, Inc. (Town Taxi); (2) CDGH, Inc. (Checker Taxi); (3) St.

Botolph Holding Co. (St. Botolph); and (4) Sixty-Five Bedford Street, Inc. (Sixty-Five Bedford) (collectively, the corporations). The issue for decision is whether petitioner is liable as a transferee under section 6901[1] for the corporations' unpaid Federal income tax liabilities, penalties, and interest. For the reasons stated herein, we find that petitioner is not liable.

                         FINDINGS OF FACT

     Some of the facts have been stipulated, and the stipulated facts are incorporated by this reference. Petitioner is the Frank Sawyer Trust of May 1992 (the trust). At the time the petition was filed, the trust's legal residence was Massachusetts.

     On March 20, 2000, Mildred Sawyer, wife of Frank Sawyer, passed away. Her taxable estate, which includes the trust, was reported as $138,480,721 on her estate's estate tax return filed December 13, 2000. This generated Federal and State transfer taxes of $76,600,416. Ms. Sawyer's daughter, Carol S. Parks (Ms. Parks), was the sole trustee of the Trust. The Trust held, among other things, 100 percent of the stock of the corporations. In order to pay the estate tax liability, Ms. Parks decided to sell the stock of the corporations.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent's assertion of transferee liability arises from the series of transactions that took place in selling the stock of the corporations during the 2000 and 2001 tax years. The stock was sold in the following manner. First, the corporations sold substantially all of their assets to unrelated third parties. Next, the trust sold all of its stock in the corporations to another unrelated third party.[2] The trust owned all of the stock of the corporations before the asset sales and at all times leading up to the stock sales.

1. The Taxi Corporations

Town Taxi and Checker Taxi (collectively, Taxi corporations) provided taxicab services in Massachusetts. Their primary assets were taxicab medallions issued by the City of Boston that gave the holder the right to provide taxicab services in Boston. In March 2000 Ms. Parks decided to begin selling the taxicab medallions. Walter McLaughlin, an attorney for the Trust, and James Milone, the CFO of the corporations (collectively, trust representatives), realized that the sales of the taxicab medallions would generate large capital gains for the Taxi corporations because of the low basis and high value of the taxicab medallions.

---

[2]Notice 2001-16, 2000-1 C.B. 826, regarding intermediary transactions was issued Jan. 18, 2001.

A.    Midcoast Credit Corp.

Mr. McLaughlin received a promotional letter in October of 1999 from Midcoast Credit Corp. (Midcoast).  Midcoast was primarily involved in the debt recovery business, which involved purchasing portfolios of delinquent credit card debt from banks and then trying to collect the debt.  They financed their debt recovery business in part through corporate acquisitions. Midcoast had a nationwide marketing strategy that included sending promotional letters to legal and accounting firms.  The promotional letter Mr. McLaughlin received included a brief history of Midcoast and described the type of target company Midcoast was interested in acquiring.  It stated that Midcoast sought to purchase the stock of C corporations that had taxable gains from asset sales and that Midcoast would pay a significant premium in excess of the amount a shareholder of the corporation would otherwise receive from an asset sale followed by a liquidation, thus enabling the shareholder to maximize the after-tax proceeds from the sale of a business.  The material described the following benefits from a sale to Midcoast:

- Significant increase in after-tax proceeds.

- Elimination of exposure to unknown future claims, losses, and litigation.

- Midcoast replaces seller as shareholder of company, receiving standard corporate representations and warranties.

- Midcoast relieves selling shareholder from unknown corporate liabilities.

- Company is solvent when sold to Midcoast.

- Midcoast represents that it will not liquidate company, but will operate it on a go-forward basis.

- Midcoast will cause the company to satisfy its tax and other liabilities.

The letter was representative of the type of promotion sent by Midcoast to other attorneys and accountants.

B. <u>The Initial Meeting</u>

Mr. McLaughlin contacted Louis Bernstein, a representative of Midcoast, and scheduled a meeting for April 7, 2000, to discuss the potential stock sale of the Taxi corporations. Because Midcoast did not have the financial resources to purchase the Taxi corporations alone, they brought in Fortrend International, LLC (Fortrend). Fortrend represented itself as an investment banking firm that specialized in structuring economic transactions to solve specific corporate and estate or accounting problems. It represented that it had offices in New York, Atlanta, San Francisco, Delray Beach, and Melbourne. Fortrend's relationship with Rabobank Nederland (Rabobank), a major international bank, gave Fortrend access to financing that Midcoast did not have.

At the meeting, Fortrend explained that it was looking to purchase the stock of corporations with capital gains and would reduce the stock purchase price by a percentage of the contingent

tax liability related to the capital gains.  The reduction percentage of the stock purchase price was generally negotiated according to the size of the transaction and associated administrative costs.  Fortrend offered to buy the stock of the Taxi corporations, but it wanted all existing and potential liabilities eliminated, except for the contingent Federal and State tax liabilities from the medallion sales, which Fortrend would assume.  It is unclear exactly what was discussed at the initial meeting in regard to the propriety of the stock sale and of Fortrend's method of offsetting the capital gains within the purchased corporations.  Jeffrey Furman, cochairman of Fortrend, negotiated the terms of the stock sales including the purchase price with the trust representatives.

C.  Due Diligence

Fortrend sent a letter to Ms. Parks representing that Fortrend had the financial resources to consummate the stock purchase.  The letter included a list of references of several law firms, a "big four" accounting firm, and Rabobank.  Rabobank also stated in a letter to Ms. Parks that Fortrend was a valued customer and Rabobank had financed a number of transactions for Fortrend.  Ms. Parks decided to go through with the stock sale subject to the performance of due diligence by the trust representatives.

The trust representatives believed Fortrend's attorneys to be from prestigious and reputable law firms. They assumed that Fortrend must have had some method of offsetting the taxable gains within the corporations. They performed due diligence with respect to Fortrend to ensure that Fortrend was not a scam operation and that Fortrend had the financial capacity to purchase the stock. The trust representatives believed Fortrend assumed the risk of overpaying for the Taxi corporations if they did not have a legal way for offsetting or reducing the tax liabilities. After due diligence was conducted, Ms. Parks decided to sell the stock on the advice of the trust representatives.

Fortrend was represented by independent counsel, Manatt, Phelps; Phillips, LLC; and Chamberlain, Hrdlicka, White, Williams & Martin (collectively, Fortrend's attorneys). Fortrend's attorneys also conducted due diligence of the Taxi corporations mainly to determine that the Taxi corporations had no unknown liabilities.

D.  The Letter of Intent, Asset Purchase Agreement, and Stock Purchase Agreement

The trust representatives sent a letter dated April 18, 2000, to Fortrend requesting a letter of intent to purchase the stock of the Taxi corporations. On April 27, 2000, Ms. Parks and Fortrend entered into letters of intent for the sale of 100 percent of the stock of the Taxi corporations. The letters of

intent were conditioned upon the conversion of all of the assets of the Taxi corporations into cash or cash equivalents before the stock sale, as well as the satisfaction of all liabilities except the contingent income tax liabilities. The Taxi corporations were allowed to keep the rights to their respective names. Moreover, the letters of intent stated that the computation of the share purchase prices would be based on the values of the cash and other assets held by the Taxi corporations minus a percentage of the outstanding contingent income tax liabilities. In the event all of the assets were not converted to cash or liabilities paid by the stock closing, the share purchase prices would be adjusted by lowering the percentage of the income tax liabilities assumed by Fortrend.

In July of 2000, the Taxi corporations entered into an asset purchase agreement with a local taxi competitor, Mr. Tutunjian, for most of the taxi medallions. The asset purchase agreement closed in September. The remaining assets were all sold or in agreements for sale with various other individuals and companies by the end of August. Town Taxi and Checker Taxi received total proceeds from their asset sales of $18,468,900 and $17,578,000, respectively, which were reinvested in Treasury bills.

On August 7, 2000, the Trust and Fortrend entered into stock purchase agreements for the stock of each of the Taxi corporations. The stock purchase agreements provided a formula

for the calculation of the stock purchase price: the purchase price would be equal to the value of the Taxi corporations' assets less 50 percent of the "Specified Remaining Tax Liability" of each. The specified remaining tax liabilities were the Federal and State tax liabilities arising from the sale of each corporation's assets.

E. Fortrend Financing

To facilitate the stock sales, Fortrend formed and controlled Three Wood, LLC (Three Wood), Baritone, Inc. (Baritone), and Tremolo, Inc. (Tremolo). Baritone and Tremolo were both wholly owned subsidiaries of Three Wood used to receive the stock of Checker Taxi and Town Taxi, respectively. On September 18, 2000, Fortrend assigned its rights and obligations in the Checker Taxi and Town Taxi stock purchase agreements to Baritone and Tremolo, respectively. However, the assignments did not relieve Fortrend of its obligations under the stock purchase agreements.

In order to pay the stock purchase price, a Fortrend-controlled entity contributed $2.7 million to Three Wood's bank account, and Fortrend financed an additional $30 million with a loan from Rabobank--borrowed via Three Wood and its wholly owned subsidiaries. Both amounts were contributed to Three Wood the day of the closing. In exchange for Rabobank's loan, Three Wood executed and delivered a promissory note, irrevocable payment

instructions, a security and assignment agreement, and a control agreement. The irrevocable payment instructions required the Taxi corporations to transfer all of their cash to Three Wood after the stock sale was complete. Neither the trust nor the trust representatives were privy to the details, including the amount of Fortrend's financing arrangement with Rabobank. The Trust and the trust representatives never saw the irrevocable payment instructions or any other loan documents, nor did they know what collateral was pledged by Three Wood as security for the loan.

F. The Stock Closing

A letter dated September 21, 2000, was sent from Fortrend's attorneys to the Trust's law firm setting forth the agreed steps to be taken at the closing of the stock purchase agreement. The letter explained that the Taxi corporations would open bank accounts at Rabobank and then transfer all of the proceeds from the sale of the Treasury bills in their respective accounts. After full payment was made to the Trust for the sale of the Taxi corporations' stock, the Trust would transfer their signature cards out of escrow to the buyers' representatives. The letter concluded that "at this point the closing shall be completed".

At the request of Fortrend, on October 3, 2000, the Trust opened accounts for the Taxi corporations at Rabobank. Before the stock sales were consummated, Ms. Parks and Mr. Milone were

the only authorized signatories for the accounts.  Ms. Parks and Mr. Milone did not grant any security interest to Rabobank in the accounts of the Taxi corporations, nor did the accounts serve as collateral for Three Wood's loan at any time the Taxi corporations were controlled by the Trust.

Three days later, on October 6, 2000, the names of Town Taxi and Checker Taxi were changed to TDGH and CDGH, respectively.[3] At the request of Fortrend, on October 10, 2000, the Trust sold all of the Treasury bills held by the Taxi corporations and transferred $18,601,779 and $21,012,306 to the Rabobank accounts of Town Taxi and Checker Taxi, respectively.  Town Taxi and Checker Taxi's Rabobank accounts remained unencumbered and in the exclusive control of the Trust at all times leading up to the stock sale.  Also on October 10, 2000, Fortrend and the trust representatives held a preclosing meeting where the final stock purchase price for the Taxi corporations was calculated under the formula provided in the stock purchase agreements.  The final stock purchase price was calculated to be $32,474,243.[4]

---

[3]The names were changed so the Trust could retain the Taxi corporations' names after the sale of their stock to Fortrend, as Fortrend did not intend to participate in the taxi business.  In order to stay consistent and avoid confusion, the Taxi corporations will continue to be referred to as Town Taxi and Checker Taxi when discussed individually.

[4]The final stock purchase price was calculated by subtracting 50 percent of the "Specified Remaining Tax Liability" (as defined in the stock purchase agreements) from the total cash

(continued...)

The closing took place the following day at the office of the Trust's attorneys.  Present at the closing were the trust representatives, Mr. Bernstein, a representative from Fortrend, and one of Fortrend's attorneys.  At this time, all employment contracts, union contracts, employee arrangements, employment benefit plans, and any other type of employee compensation arrangements or programs at the Taxi corporations had been terminated or were in the process of being terminated.  All taxicab operations of the Taxi corporations had ceased.  The only remaining assets of the Taxi corporations were $39,619,286 in cash and prepaid estimated State tax payments of $5,200. Their only known liabilities were unresolved tort and employee benefit plan liabilities and the contingent Federal and State tax liabilities arising from the asset sales.  The Trust assumed all liabilities except the tax liabilities.

All of the documents necessary to consummate the stock sale and transfer the stock of the Taxi corporations were executed by the Trust before the closing and held in escrow by the Trust's attorneys.  The closing took place in the following manner:  (1) Three Wood wired $32,481,395, the agreed final stock purchase price plus interest, to the Trust's bank account; and (2) upon

---

[4](...continued)
of $39,619,286 held by the Taxi corporations.  The "Specified Remaining Tax Liability" was calculated to be $14,290,090. Therefore, the final stock purchase price was $32,474,243 [$39,619,286 - (50% x $14,290,090)].

confirmation of the Trust's receipt of the final purchase price, the closing documents were delivered out of escrow, resulting in the transfer of the Town Taxi stock to Tremolo, the Checker Taxi stock to Baritone, and the resignation of the officers and directors of the Taxi corporations. Three Wood then appointed its own officers and directors of the Taxi corporations and had Tremolo and Baritone merge into Town Taxi and Checker Taxi, respectively. Town Taxi and Checker Taxi became wholly owned subsidiaries of Three Wood as a result of the merger. Therefore, Three Wood was in control of the Taxi corporations' Rabobank bank accounts. At the time of the sale of the trust's stock to the Fortrend-controlled entities, the Taxi corporations were solvent--they possessed total cash in excess of $39 million and contingent Federal and State income tax liabilities of approximately $14 million.

G.  Fortrend's Postclosing Transactions

On the same day the stock sales were completed, pursuant to the loan agreements between Rabobank and Three Wood, the cash of the Taxi corporations became security for Three Wood's Rabobank loan, and the cash balances of the Taxi corporations were transferred to Three Wood. The following day, October 12, 2001, Three Wood paid $30,007,808 to Rabobank to repay its loan and transferred $4,683,964 and $5,055,176 back to bank accounts of Checker Taxi and Town Taxi, respectively. Accordingly, on the

day following the completion of the stock sales, the Taxi corporations had cash of $9,739,140 and contingent Federal and State income tax liabilities of approximately $14 million.

From October 13 through December 29, 2000, Fortrend caused Checker Taxi to make numerous transfers, resulting in a yearend account balance of $308,639.  Similarly, Fortrend caused Town Taxi to make various transfers resulting in a yearend account balance of $93,602.  None of these transfers were made to the Trust.  Moreover, before the closing of the Taxi corporations' 2000 tax year, a Fortrend-controlled entity transferred Trex Communications stock to Town Taxi and Checker Taxi and also transferred Paclaco Equities stock to Checker Taxi.  At the time of the stock sales, neither Ms. Parks nor the trust representatives knew about the postclosing merger or the contributions of the Trex Communications or Paclaco Equities stock contemplated by Fortrend.  After the Taxi corporations were acquired and controlled by Fortrend, Ms. Parks and the trust representatives were not involved in any of Fortrend's activities with respect to the Taxi corporations.

2.  The Real Estate Corporations

St. Botolph and Sixty-Five Bedford (collectively, Real Estate corporations) were Massachusetts corporations that owned real estate in Boston that was either leased or operated as garages and parking lots.  Some of these properties were rented

to the Taxi corporations and used in their operations.  In 2001 the Real Estate corporations sold their respective parcels of real estate to two different section 501(c)(3) educational institutions.  Like the Taxi corporations, the Real Estate corporations realized gain on the sales and were left holding large amounts of cash.

A.  St. Botolph

St. Botolph owned three properties (St. Botolph properties) located amid properties owned by Northeastern University (Northeastern) in Boston.  Because of that proximity, Northeastern offered St. Botolph $22 million for the St. Botolph properties.  Northeastern was not interested in acquiring the stock of St. Botolph.  Ms. Parks, on behalf of St. Botolph, agreed to sell the St. Botolph properties to Northeastern.

On February 1, 2001, the sale of the St. Botolph properties to Northeastern was consummated, and St. Botolph received net proceeds of $21,775,341, which were deposited into St. Botolph's account at Sovereign Bank.  Following the sale, St. Botolph's only asset was the proceeds from the sale of the St. Botolph properties and its only remaining liabilities were the contingent Federal and State corporate income tax liabilities arising from the sale.  Realizing that St. Botolph faced a tax situation similar to that of the Taxi corporations, the trust representatives contacted Midcoast and Fortrend about purchasing

the stock of St. Botolph.  Fortrend offered to purchase the stock.

The series of events leading up to the stock closing were substantially similar to those that took place with the Taxi corporations.

i.  <u>Fortrend Financing</u>

Fortrend financed the stock purchase with another loan from Rabobank for $19 million using a controlled subsidiary, Monte Mar, Inc. (Monte Mar), as the borrower.  Monte Mar executed and delivered various documents to Rabobank, including a promissory note, irrevocable payment instructions, and a security and assignment agreement.  Moreover, a Fortrend representative, as the purported president of St. Botolph, guaranteed payment of the Rabobank loan on behalf of St. Botolph, even though the representative did not have the authority to do so until after the stock sale was complete.  The irrevocable payment instructions required St. Botolph to transfer all of its cash to Monte Mar following the stock sale.  Again, the Trust was not privy to any of the financing details, nor was it a party to the loan.  The Trust never saw the irrevocable payment instructions or any of the Rabobank loan documents, nor did it know what collateral Monte Mar pledged to secure its loan.  On February 20, 2001, at the request of Fortrend, the Trust had St. Botolph open a bank account at Rabobank.  Ms. Parks and Mr. Milone were the

only authorized signatories on the account. They did not grant a security interest to Rabobank in this account, nor did the account serve as collateral for Monte Mar's loan while St. Botolph was controlled by the Trust.

        ii.   The Stock Purchase Agreement

On February 26, 2001, the day before the stock closing, St. Botolph transferred all of its funds, $21,651,135, to its newly created Rabobank account. That same day, a Fortrend representative signed and delivered instructions to Rabobank to place all of St. Botolph's funds in an overnight time deposit. Even though the Fortrend representative had no signatory authority over the account, Rabobank complied with the instructions.

On February 27, 2001, the Trust and Monte Mar entered into a stock purchase agreement for the stock of St. Botolph. The formula to determine the purchase price of the St. Botolph stock was essentially the same as the formula used previously for the Taxi corporations' stock. However, for this deal the parties agreed that the stock purchase price would be reduced by only 37.5 percent of the specified remaining tax liability, rather than the 50 percent used in the Taxi corporations' deals. The final stock purchase price was $18,453,421.[5] Under the stock

_____

[5]The final stock purchase price was calculated by subtracting 37.5 percent of the specified remaining tax liability
                              (continued...)

purchase agreement, Monte Mar would acquire St. Botolph subject to its contingent Federal and State income tax liabilities. Monte Mar was obligated to file corporate tax returns reporting the gains from the St. Botolph's asset sales.

### iii. The Stock Closing

The stock closing also took place on February 27, 2001, at the office of the Trust's attorneys. The trust representatives, a representative of Fortrend, and one of Fortrend's attorneys were present at the closing. At this time, St. Botolph had ceased all operations and had no employees. Its only asset was cash and only liabilities were contingent Federal and State income tax liabilities. The Trust had executed all of the documents necessary to consummate the stock sale before the closing and placed them in escrow with their attorneys. The documents were not released from escrow until after the full stock purchase price was transferred to the Trust's bank account.

As for the Taxi corporations' stock sale, on the day of closing Rabobank wired $19 million to Monte Mar. Thereafter, Monte Mar wired $18,456,186, the agreed-upon purchase price plus interest, to the Trust's bank account. The stock closing documents were then delivered out of escrow, resulting in the

---

[5](...continued)
from the total cash of $21,651,135 held by St. Botolph. The specified remaining tax liability was calculated to be $8,527,237. Therefore, the final stock purchase price was $18,453,421 [$21,651,135 - (37.5% x $8,527,237)].

delivery of the St. Botolph stock to Monte Mar and the resignation of the officers and directors of St. Botolph. Thereafter, Monte Mar appointed new officers and directors of St. Botolph. Monte Mar then merged into St. Botolph, giving Fortrend legal control of St. Botolph and its bank account. Upon the consummation of the stock sale, St. Botolph's cash in the Rabobank accounts became security for Monte Mar's Rabobank loan. At the time of the sale of its stock to Monte Mar, St. Botolph was solvent and had a sufficient cash balance to fully satisfy its contingent Federal and State income tax liabilities.

### iv. Fortrend's Postclosing Transactions

Pursuant to the irrevocable payment instructions, after the stock sale was consummated St. Botolph transferred $19 million to Monte Mar, leaving $2,749,820 in St. Botolph's account. The following day, Monte Mar repaid its Rabobank loan in full. Thereafter, from March 1, 2001, through December 31, 2001, St. Botolph made various transfers resulting in a yearend balance of approximately $365,000. None of these transfers were made to the Trust. Before the closing of St. Botolph's 2001 tax year, a Fortrend-controlled entity transferred TelCel Equities (TelCel) stock and Theodor Tower, Inc. (Theodor) stock to St. Botolph. At the time of the stock sale Ms. Parks and the trust representatives did not know about the postclosing merger or the contribution of the TelCel and Theodor stock contemplated by

Fortrend. After St. Botolph was acquired by Monte Mar, St. Botolph was controlled by Fortrend, and Ms. Parks and the trust representatives were not involved in any of Fortrend's activities with respect to St. Botolph.

B. Sixty-Five Bedford

Sixty-Five Bedford owned three properties: 156 Ipswich Street, 38 Isabella Street, and 8-12 Somerset Street. Sixty-Five Bedford's 8-12 Somerset Street property (Somerset Street property) was on Beacon Hill near Suffolk University (Suffolk). Suffolk was interested in acquiring the Somerset Street property in order to build a dormitory. Suffolk offered to pay Sixty-Five Bedford $5.5 million for the property. Suffolk wanted to acquire only the property. It did not want to acquire the stock of Sixty-Five Bedford. Ms. Parks, on behalf of Sixty-Five Bedford, agreed to sell the Somerset Street property to Suffolk.

On September 30, 2001, Sixty-Five Bedford transferred the 156 Ipswich Street and 38 Isabella Street properties to other entities owned by the Trust. On October 1, 2001, the sale of the Somerset Street property to Suffolk was consummated, and Sixty-Five Bedford received net proceeds of $5,474,920. Following these transactions, Sixty-Five Bedford's only asset was cash and its only liabilities were the contingent Federal and State income tax liabilities resulting from the asset sales. Once again the

trust representatives contacted Midcoast and Fortrend about purchasing the stock of Sixty-Five Bedford. By letter dated March 5, 2001, Midcoast notified the Trust that Fortrend was interested in purchasing 100 percent of the stock.

i.  Fortrend Financing and the Stock Closing

Because of the smaller size of the transaction, Fortrend did not use Rabobank to finance the stock purchase. Fortrend used another controlled entity, SWRR, Inc. (SWRR), to acquire the stock of Sixty-Five Bedford. On October 3 and 4, 2001, a Fortrend-controlled entity (SEAP) contributed $4,500,000 and $417,000, respectively, to SWRR.

On October 4, 2001, the parties executed the stock purchase agreement and completed the stock closing. The stock purchase price of $4,916,834 was calculated similarly to that of the three previous agreements, but the percentage split of the specified remaining tax liability was adjusted back to 50 percent because of the smaller size of the transaction.[6] Once again, by the closing date Sixty-Five Bedford had no employees and all of its operations had ceased. Its only asset was cash, and its only liabilities were the contingent Federal and State income tax

---

[6]The final stock purchase price was calculated by subtracting 50 percent of the specified remaining tax liability (as defined in the stock purchase agreements) from the total cash of $5,937,336 held by Sixty-Five Bedford. The specified remaining tax liability was calculated to be $2,041,002. Therefore, the final stock purchase price was $4,916,834 [$5,937,336 - (50% x $2,041,002)].

liabilities from the asset sales.  The stock purchase agreement specified that SWRR would acquire Sixty-Five Bedford subject to its contingent Federal and State corporate income tax liabilities and that SWRR was obligated to file corporate tax returns and report the gains from the asset sales.

At the time of closing, the Trust had executed all documents necessary to transfer the stock and placed them in escrow with its attorneys.  On the day of closing, SWRR transferred $4,916,834 to the Trust's bank account as consideration for the Sixty-Five Bedford stock.  Upon confirmation of receiving the funds, the Trust delivered Sixty-Five Bedford's closing documents out of escrow, resulting in essentially the same process as the other transactions.  Thereafter, SWRR merged into Sixty-Five Bedford, giving Fortrend control of Sixty-Five Bedford's bank account.  At the time of the sale of stock, Sixty-Five Bedford was solvent and had a sufficient cash balance to fully satisfy the contingent Federal and State corporate income tax liabilities.

ii.  Fortrend's Postclosing Transactions

On October 5, 2001, the day following the stock sale, Fortrend caused Sixty-Five Bedford to transfer $4,942,000 to SWRR, leaving Sixty-Five Bedford with a $995,336 account balance. Immediately thereafter, Fortrend caused SWRR to transfer the $4,942,000 to SEAP in repayment of the SEAP loans.  From October

5 through December 31, 2001, Fortrend caused Sixty-Five Bedford to make various transfers. None of these transfers were made to the Trust. As of December 31, 2001, Sixty-Five Bedford had a bank account balance of $336,833. The Trust did not receive any funds from Sixty-Five Bedford after the stock sale, nor did it own any interest in any entity that received funds from Sixty-Five Bedford. Before the closing of Sixty-Five Bedford's 2001 tax year, a Fortrend-controlled entity transferred Treasury bills to Sixty-Five Bedford. At the time of the stock sale, neither Ms. Parks nor the trust representatives knew about the postclosing merger or the contribution of Treasury bills contemplated by Fortrend. After the stock sale, Sixty-Five Bedford was controlled by Fortrend, and Ms. Parks and the trust representatives were not involved in Fortrend's activities with respect to Sixty-Five Bedford.

3. <u>The Trust's Tax Returns</u>

The Trust reported the sales of the corporations' stock on its fiduciary income tax returns for tax years 2000 and 2001. The Trust reported the following on its 2000 income tax return:

| Entity | Date of Sale | Sale Price | Basis | Gain |
|--------|--------------|------------|-------|------|
| Town Taxi | 10/9/2000 | $14,850,702 | $14,850,702 | -0- |
| Checker Taxi | 10/9/2000 | 17,880,694 | 17,880,694 | -0- |

The Trust reported the following on its amended 2001 income tax return:

| Entity | Date of Sale | Sale Price | Basis | Gain |
|--------|--------------|------------|-------|------|
| St. Botolph | 2/26/2001 | $18,480,194 | $6,985,296 | $11,494,898 |
| Sixty-Five Bedford | 10/4/2001 | 6,096,834 | 3,725,341 | 2,371,493 |

Respondent examined the Trust's 2000 and 2001 tax returns and issued notices of deficiency for both tax years in regard to the sales of the corporations' stock.[7]  The Trust filed petitions in this Court, and on February 14, 2006, pursuant to compromises between the parties, we entered decisions holding that there were no deficiencies in the Trust's Federal income tax liability for either tax year.[8]

## 4. The Corporations' Tax Returns

As discussed above, Fortrend-controlled entities purchased the stock of the corporations subject to their contingent Federal and State income tax liabilities and were obligated to file the corporations' tax returns and report the corporations' gains on their asset sales.

--------

[7]The notices essentially explained that the Internal Revenue Service's position was that the corporations in effect sold all of their assets, paid all of their liabilities, and liquidated. Because the Trust was the sole shareholder of the corporations, the Trust received the liquidation proceeds and was required to report the gain pursuant to sec. 331(a).

[8]The decision documents reflected a compromise by the parties and were not the result of a trial on the merits. Neither this Court nor the decision documents addressed any of respondent's theories for determining a deficiency, nor were there any pertinent stipulations between the parties other than that the Trust did not have a deficiency in tax or owe any penalties.

Fortrend caused the Taxi corporations to each file Form 1120, U.S. Corporation Income Tax Return, for the taxable year ended December 31, 2000. With respect to the sale of its taxi medallions, Town Taxi reported on Schedule D, Capital Gains and Losses, proceeds of $18,468,900 and a cost basis of $2,740,000, resulting in a recognized long-term capital gain of $15,728,900. Additionally, Town Taxi reported a long-term capital loss of $18,495,188 from the disposition of Trex Communications stock. This resulted in Town Taxi's reporting a net long-term capital loss of $2,766,288.

Checker Taxi's Schedule D reported proceeds of $17,578,000 and a cost basis of zero with respect to the sale of its taxicab medallions, resulting in a recognized long-term capital gain of $17,578,000. Moreover, Checker Taxi's reported long-term capital losses of $13,097,812 and $3,766,154 from the disposition of Trex Communications stock and Paclaco Equities stock, respectively. This resulted in Checker Taxi's reporting a net long-term capital loss of $714,034.

Fortrend caused St. Botolph to file a Form 1120 for the taxable year ended December 31, 2001. St. Botolph's Schedule D reported $22 million in proceeds and a cost basis of $1,102,509 with respect to its sale of real estate, resulting in a recognized long-term capital gain of $20,897,491. St. Botolph also reported long-term capital losses of $8,400,000 and

$15,820,000 from the disposition of Telcel and Theodor stock, respectively. This resulted in a net long-term capital loss of $3,322,509.

Fortrend also caused Sixty-Five Bedford to file a Form 1120 for the taxable year ended December 31, 2001. Sixty-Five Bedford's Schedule D reported aggregate long-term capital gains from the sale of its assets of $5,195,474, and a long-term capital loss of $5,170,475 from the sale of Treasury bills, resulting in a net long-term capital gain of $24,999. Neither Ms. Parks nor the trust representatives reviewed any of the corporations' returns.

Respondent examined the income tax returns of the Taxi corporations for the tax year ended December 31, 2000. Following the examination, respondent disallowed the losses claimed with respect to Trex Communications and Paclaco Equities stock and asserted penalties against the Taxi corporations. The Taxi corporations and respondent entered into closing agreements signed on July 11, 2005, whereby the Taxi corporations agreed to the disallowance of the claimed losses and the imposition of the accuracy-related penalty under section 6662.

Respondent also examined the income tax returns of the Real Estate corporations for the tax year ended December 31, 2001. After the examination, respondent disallowed St. Botolph's claimed losses on the disposition of Theodor and Telcel stock and

Sixty-Five Bedford's claimed losses on the disposition of Treasury bills. Respondent asserted accuracy-related penalties under section 6662 in both instances. St. Botolph entered into a closing agreement with respondent signed on July 11, 2005, where St. Botolph agreed to the disallowance of the claimed losses and the imposition of the accuracy-related penalty. Furthermore, Sixty-Five Bedford entered into a closing agreement with respondent signed on January 10, 2006, where Sixty-Five Bedford agreed to the disallowance of the claimed losses and the imposition of the accuracy-related penalty.

The Trust was not a party to any of the closing agreements. Moreover, neither Ms. Parks nor the trust representatives participated in any of the examinations of the corporations. The closing agreements set forth the following liabilities:

| Entity | Year | Tax | Penalty Sec. 6662 |
|--------|------|-----|-------------------|
| Town Taxi | 2000 | $6,100,159 | $1,145,027 |
| Checker Taxi | 2000 | 5,722,441 | 1,142,019 |
| St. Botolph | 2001 | 6,839,682 | 1,367,936 |
| Sixty-Five Bedford | 2001 | 1,644,315 | 328,863 |

Respondent was unable to collect against the corporations because they were insolvent at the time the closing agreements were entered into and the taxes and penalties were assessed. On December 8, 2006, respondent issued four statutory notices of liability to the Trust (notices of transferee liability), determining that the Trust is liable as transferee for the unpaid

Federal income tax liabilities and penalties of the corporations as set out in the table above.

The Trust timely filed a petition contesting respondent's determination that it was liable as a transferee. Thereafter, the Trust filed a motion for summary judgment, which we denied.[9] A trial was held in Boston, Massachusetts, on October 18, 2010.

OPINION

Section 6901(a)(1) is a procedural statute authorizing the assessment of transferee liability in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the transferee liability was incurred. Section 6901(a) does not create or define a substantive liability but merely provides the Commissioner a remedy for enforcing and collecting from the transferee of the property the transferor's existing liability. Coca-Cola Bottling Co. v. Commissioner, 334 F.2d 875, 877 (9th Cir. 1964), affg. 37

---

[9]As discussed above, before this transferee action respondent issued notices of deficiency against the trust for the fiduciary Federal income taxes arising from the stock sales of the corporations. Respondent contended that the stock sales should be recast as asset sales followed by liquidating distributions. However, the parties ended up entering a stipulated decision finding that the trust was not liable for the income taxes associated with the stock sales. Thereafter, when respondent issued the trust the notice of transferee liability for the stock sales, the trust filed a motion for summary judgment based on res judicata and collateral estoppel. We denied the trust's motion for summary judgment on the grounds that "the Trust's liability as transferee is not the same as the Trust's fiduciary tax liability."

T.C. 1006 (1962); Mysse v. Commissioner, 57 T.C. 680, 700-701 (1972).  Section 6902(a) and Rule 142(d) provide that the Commissioner has the burden of proving the taxpayer's liability as a transferee but not of showing that the transferor was liable for the tax.

Under section 6901(a) the Commissioner may establish transferee liability if a basis exists under applicable State law or State equity principles for holding the transferee liable for the transferor's debts.  Commissioner v. Stern, 357 U.S. 39, 42-47 (1958); Bresson v. Commissioner, 111 T.C. 172, 179-180 (1998), affd. 213 F.3d 1173 (9th Cir. 2000); Starnes v. Commissioner, T.C. Memo. 2011-63; Diebold v. Commissioner, T.C. Memo. 2010-238. "[T]he existence and extent of liability should be determined by state law." Commissioner v. Stern, supra at 45 (emphasis added). Thus, State law determines the elements of liability, and section 6901 provides the remedy or procedure to be employed by the Commissioner as the means of enforcing that liability.  Ginsberg v. Commissioner, 305 F.2d 664, 667 (2d Cir. 1962), affg. 35 T.C. 1148 (1961).

We must determine whether respondent has shown that the trust was liable as a transferee.

I.  Massachusetts Uniform Fraudulent Transfer Act (MUFTA)

The law of the State where the transfer occurred (in this case, Massachusetts) controls the characterization of the

transaction. See Commissioner v. Stern, supra at 45. Respondent argues that under Massachusetts law, the substance of the transaction controls, not the form.

Massachusetts has adopted the Uniform Fraudulent Transfer Act (MUFTA). Mass. Ann. Laws ch. 109A, secs. 1-12 (LexisNexis 2005) (hereinafter MUFTA). MUFTA includes provisions imposing transferee liability on the transferee of a debtor's property on grounds of both actual and constructive fraud. See id. sec. 5(a)(1) (actual fraud); id. secs. 5(a)(2), 6 (constructive fraud). A "transfer" is defined as every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset and includes payment of money, release, lease, and creation of a lien or other encumbrance. Id. sec. 2. Respondent bears the burden of proving that the trust is liable under Massachusetts law as a transferee. See sec. 6902(a). Furthermore, because fraud is never presumed, creditors attacking a conveyance as fraudulent have the burden of establishing fraud. Mullins v. Riopel, 76 N.E.2d 633 (Mass. 1948); Rioux v. Cronin, 109 N.E. 898 (Mass. 1915). Therefore, respondent must prove that there was a fraudulent disposition of property from the corporations to the trust.

MUFTA does not set forth specific standards of proof to establish transferee liability under MUFTA sections 5(a)(1) and

(2) and 6.  However, the U.S. Bankruptcy Court for the District of Massachusetts (the bankruptcy court), in applying MUFTA, has found that actual fraud must be proven by clear and convincing evidence, Murphy v. Meritor Bank (In re O'Day Corp.), 126 Bankr. 370, 410 (Bankr. D. Mass. 1991), and constructive fraud must be proven by a preponderance of the evidence, Ferrari v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.), 148 Bankr. 97, 131 (Bankr. D. Mass 1992).  Respondent claims to have met the relevant standards of proof for MUFTA sections 5(a)(1) and (2) and 6 in showing fraudulent transfers to the trust.

II.  Constructive Fraudulent Transfer Under MUFTA Section 5(a)(2)

Under MUFTA section 5(a)(2), a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor: (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (2) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

The Uniform Fraudulent Transfer Act is a uniform act that derived the phrase "reasonably equivalent value" from 11 U.S.C. section 548. See Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.), 139 F.3d 574, 577 (7th Cir. 1998). Reasonably equivalent value has been construed to include both direct and indirect benefits to the transferor, even if the benefit does not increase the transferor's net worth. See id. at 578. "There need not be a dollar-for-dollar exchange to satisfy the reasonable equivalence test"; rather, the court should simply compare "'the value of what went out [of the debtor's estate] with the value of what came in'." Southmark Corp. v. Riddle, 138 Bankr. 820, 829 (Bankr. N.D. Tex. 1992) (quoting Heritage Bank Tinley Park v. Steinberg (In re Grabill Corp.), 121 Bankr. 983, 994 (Bankr. N.D. Ill. 1990).

In CHC Indus., Inc. v. Commissioner, T.C. Memo. 2011-33, we held the taxpayer liable as a transferee when the taxpayer directly received a fraudulent "consulting" payment from a recently acquired Fortrend entity. The taxpayer knew the payment was fraudulent and received the payment directly from the insolvent entity.

Respondent's arguments under MUFTA are predicated on the assumption that the series of transactions among the asset purchaser, the Trust, Midcoast, and Fortrend should be collapsed and treated as if the corporations had sold their assets and then

made liquidating distributions to the trust.  If the transactions are collapsed accordingly, then the corporations will have transferred substantially all of their assets to the trust and received virtually nothing in exchange, let alone reasonably equivalent value.  If the preceding is found, it follows that the trust will be liable as a transferee of the corporations' assets under MUFTA section 5(a)(2).

We were recently confronted with the same issue in Starnes v. Commissioner, T.C. Memo. 2011-63.  In Starnes, the taxpayers each owned 25 percent of the stock of Tarcon, a freight consolidation corporation.  The Tarcon shareholders had sold all of the assets of Tarcon to an unrelated third party, so that Tarcon had only cash and contingent Federal and State corporate income tax liabilities.  Midcoast and the Tarcon shareholders entered into a contract to sell the Tarcon stock, where Midcoast was obligated to file corporate tax returns and report the capital gains arising from Tarcon's asset sales.  After Midcoast failed to pay Tarcon's income tax liabilities, the Commissioner asserted a transferee liability action against the Tarcon shareholders.

We applied State fraudulent conveyance law to determine whether the Tarcon shareholders should be liable for the income tax liabilities of Tarcon.  Specifically, we focused on whether all the parties involved knew of the multiple transactions,

including Midcoast's fraudulent scheme to offset Tarcon's tax liabilities.  We held that because the Commissioner failed to show the taxpayers' knew of Midcoast's fraudulent scheme, the transactions should not be collapsed to determine whether Tarcon received reasonably equivalent value as required under the North Carolina Uniform Fraudulent Transfer Act (NCUFTA).  We then applied NCUFTA without collapsing the transactions and found that because there was no fraudulent conveyance to the taxpayers, they were not liable as transferees of Tarcon's assets.  We believe the approach in Starnes to be the correct approach for a transferee liability action.

Whether the transactions should be "collapsed" is a difficult issue of State law on which there is fairly limited precedent.  Brandt v. Wand Partners, 242 F.3d 6, 12 (1st Cir. 2001).  While the Massachusetts courts do not provide much guidance for collapsing transactions among multiple parties in the context of transferee liability, the bankruptcy court offers some assistance.

The bankruptcy court will overlook the form of a transaction and collapse multiple steps taken by parties according to the knowledge and intent of the parties involved.  Murphy v. Meritor Bank (In re O'Day Corp.), supra at 394 (citing Wieboldt Stores, Inc. v. Schottenstein, 94 Bankr. 488, 502 (N.D. Ill. 1988)).  Murphy involved a leveraged buyout (LBO), where the court found

that all parties were aware of the structure of the transaction and participated in implementing it.  Therefore, the court focused on the substance of the LBO as one transaction, not on its form.  Furthermore, in Consove v. Cohen (In re Roco Corp.), 21 Bankr. 429, 436 (B.A.P. 1st Cir. 1982), the court looked to whether a series of transactions was made at arm's length to determine whether the substance or the form of the transactions should control.  Finally, when the parties meant for the various transactions to occur together, the court found it should collapse the various transactions and treat them as one integrated transaction.  See Ferrari v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.), 148 Bankr. at 134.

Other courts have similarly found that in determinations of whether to collapse multiple transactions, the party arguing that the transaction should be avoided must prove that the multiple transactions were linked and that the purported transferee had either actual or constructive knowledge of the entire scheme. HBE Leasing Corp. v. Frank, 48 F.3d 623, 636 n.9 (2d Cir. 1995); Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., 284 Bankr. 355, 370-371 (Bankr. S.D.N.Y. 2002). "Where a transfer is actually 'only a step in a general plan,' an evaluation is made of the entire plan and its overall implications.'" Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., supra at 370 (quoting Orr v.

Kinderhill Corp., 991 F.2d 31, 35 (2d Cir. 1993)).  On the basis of the authorities discussed, respondent must establish the trust had actual or constructive knowledge.

We must first determine whether the trust had actual knowledge.  Respondent stipulated for all of the stock sales that at the time of the stock sales neither Ms. Parks nor the trust representatives knew about the postclosing merger or the contribution of inflated-basis stock contemplated by Fortrend.  Reviewing this stipulation and the record as a whole, we do not find that the trust had actual knowledge.

We must next determine whether the trust had constructive knowledge.  Constructive knowledge may be found where the initial transferee became aware of circumstances that should have led to further inquiry into the circumstances of the transaction, but no inquiry was made.  See HBE Leasing Corp. v. Frank, supra at 636.  Further inquiry was likely warranted considering Fortrend agreed to pay the trust more than the net book value of the company when the only assets were cash and the only liabilities were income tax liabilities.  It is unclear what level of inquiry the trust made in regard to what Fortrend planned to do to offset the capital gains, including whether Fortrend's actions would be proper.  The trust representatives argue that they did not inquire as to what Fortrend intended to do about the tax liability, and also that they were inquisitive at the initial

meeting with Fortrend and conducted due diligence of the transaction but could not find anything wrong. Respondent argues that the trust representatives should have known that Fortrend intended to fraudulently offset the capital gains of the corporations, but also concedes that the representatives did not have enough information to draw a conclusion regarding the propriety of the transaction.

While there is uncertainty as to the trust's level of inquiry regarding Fortrend's postclosing activities, respondent bears the burden of proof. There are legitimate transactions that Fortrend could have contemplated, yet respondent fails to explain why the trust was obligated to determine the propriety of Fortrend's postclosing activities. Respondent's contention that the trust should have known that Fortrend intended to fraudulently offset the capital gains of the corporations is insufficient to support a finding by a preponderance of the evidence that the trust had constructive knowledge of the entire scheme, including the subsequent purchase and sale of inflated-basis stock to purportedly generate losses for the corporations.

Respondent stipulated for all of the stock sales that the trust did not know of the postclosing mergers or contributions of inflated-basis stock contemplated by Fortrend. Reviewing this stipulation and the record as a whole, we do not find that the trust had constructive knowledge.

Because we hold that respondent has not met his burden of proving that the transactions should be collapsed, we will respect the form of the transactions in our application of MUFTA to the stock sales. Thus, we will not collapse the transactions to determine whether the corporations received reasonably equivalent value. With respect to the corporate stock sales, the trust received in aggregate approximately $56 million from Fortrend in exchange for the stock of the corporations. None of the cash held in the corporations' bank accounts was used to purchase the stock from the trust. The funds used to purchase the stock were borrowed from Rabobank--none of the money held by the corporations was used in the stock purchases. All of the corporations had sufficient cash assets to pay their respective contingent income tax liabilities both before and after the stock sales. The corporations transferred their cash to Fortrend-related entities after ownership was transferred to Fortrend. Nothing from the corporations was transferred to the trust. Thus, we conclude that the requirements of MUFTA section 5(a)(2) have not been satisfied.

III. Constructive Fraudulent Transfer Under MUFTA Section 6

Additionally, MUFTA section 6(a) provides that a transfer made or obligation incurred by a debtor is fraudulent as to the creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or

incurred the obligation without receiving reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation. A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation. Id. sec. 3(a).

Respondent is required to show that the corporations made transfers without receiving reasonably equivalent value in exchange for the transfers and that the corporations were insolvent at the time or became insolvent as a result of the transfers. See id. As discussed above with respect to the requirement of MUFTA section 5(a)(2), respondent has not shown that the corporations made transfers to the trust; therefore the trust was not required to provide reasonably equivalent value to the corporations. Thus, we conclude that the requirements of MUFTA section 6 have not been satisfied.

IV. Actual Fraudulent Transfer Under MUFTA Section 5(a)(1)

MUFTA section 5(a)(1) provides that a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor. In determining

actual intent, consideration may be given, among other factors, to whether:

>     (1) The transfer or obligation was to an insider;
>
>     (2) the debtor retained possession or control of the property transferred after the transfer;
>
>     (3) the transfer or obligation was disclosed or concealed;
>
>     (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
>     (5) the transfer was of substantially all the debtor's assets;
>
>     (6) the debtor absconded;
>
>     (7) the debtor removed or concealed assets;
>
>     (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
>     (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
>     (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
>     (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Id. sec. 5(b).

To prevail under this section of MUFTA, respondent must show that the transfer was made "with intent to hinder, delay, or defraud" creditors. "While the 'presence of a single badge of fraud may spur mere suspicion, the confluence of several can

constitute conclusive evidence of an actual intent to defraud.'"
Hasbro, Inc. v. Serafino, 37 F. Supp. 2d 94, 98 (D. Mass. 1999)
(quoting Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926
F.2d 1248, 1254-1255 (1st Cir. 1991)).  Respondent contends that
factors 1, 3, 5, 8, 9, and 10 of MUFTA section 5(b) are present.

Factor 1.  Whether the Transfer or Obligation Was to an
          Insider

The trust was an insider as a person in control of the
corporations before the sale of the stock to Fortrend.  See MUFTA
sec. 2.  However, because the transactions were not collapsed,
respondent has not shown that the transfers to the trust were
from the corporations.

Factor 3.  Whether the Transfer or Obligation Was Disclosed
          or Concealed

Respondent argues that the distributions from the
corporations were concealed as proceeds from stock sales.
However, the transactions in dispute were all reported on the
appropriate tax returns.  The Trust reported the sales of the
stock of all of the corporations, and the corporations reported
the asset sales on their respective returns.

Factor 5.  Whether the Transfer Was of Substantially All the
          Debtor's Assets

Respondent argues that the corporations transferred
substantially all of their assets to the trust.  While the
corporations did transfer substantially all of their assets after
the stock sales, as the transactions are not collapsed, the

transfers made by the corporations were to Fortrend-related entities, not the trust.

Factor 8.   Whether the Value of the Consideration Received by the Debtor Was Reasonably Equivalent to the Value of the Asset Transferred or the Amount of the Obligation Incurred

The corporations did not receive reasonably equivalent value in exchange for their transfers of assets, but as the transactions are not collapsed, the transfers by the corporations were to Fortrend-related entities, not the trust.

Factor 9.   Whether the Debtor Was Insolvent or Became Insolvent Shortly After the Transfer Was Made or the Obligation Was Incurred

As discussed, a debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.  MUFTA sec. 3(a).  Additionally, a debtor who is generally not paying his debts as they come due is presumed to be insolvent.  Id. sec. 3(b).  After the asset sales and at all times leading up to the stock sales the corporations' cash balances far exceeded their contingent income tax liabilities. Moreover, while the corporations became insolvent after transferring substantially all of their assets to Fortrend-related entities, as the transactions are not collapsed the trust did not receive anything from the corporations either before or after the stock sales.

Factor 10.  Whether the Transfer Occurred Shortly Before or Shortly After a Substantial Debt Was Incurred

The transfer of the corporations' assets to Fortrend-related entities did occur shortly after the corporations incurred contingent Federal and State corporate income tax liabilities from the sales of their assets.  However, respondent has not shown that any transfer of the corporations' assets was made to the trust, resulting in the corporations' inability to pay the liabilities at the time of their respective stock sales.

After weighing the factors and recognizing that no one factor is dispositive, we conclude that respondent has not shown that a transfer was made with intent to hinder, delay, or defraud respondent.

V.  Federal Tax Doctrines

While we affirm that the existence and extent of transferee liability should be determined by State law if substance over form and its related doctrines are applicable, we find that the form of the stock sales should be respected in this case.

Respondent asks us to apply the substance over form doctrine to recast the stock sales as "asset sales followed by liquidating distributions".  Courts use substance over form and its related judicial doctrines to determine the true meaning of a transaction disguised by formalisms that exist solely to alter tax liabilities.  See United States v. R.F. Ball Constr. Co., 355 U.S. 587 (1958); Commissioner v. Court Holding Co., 324 U.S. 331

(1945); <u>Volvo Cars of N. Am., LLC v. United States</u>, 571 F.3d 373 (4th Cir. 2009); <u>Rose v. Commissioner</u>, T.C. Memo. 1973-207.  In such instances, the substance of a transaction, rather than its form, will be given effect.  We generally respect the form of a transaction, however, and will apply the substance over form principles only when warranted.  See <u>Gregory v. Helvering</u>, 293 U.S. 465 (1935); <u>Blueberry Land Co. v. Commissioner</u>, 361 F.2d 93, 100-101 (5th Cir. 1966), affg. 42 T.C. 1137 (1964).

Furthermore, "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." <u>Gregory v. Helvering</u>, <u>supra</u> at 469.  Nonetheless, a transaction "having no business or corporate purpose * * * the sole object and accomplishment of which was the consummation of a preconceived plan" to avoid taxation cannot be respected.  <u>Id.</u>

Here, we find that substance over form and its related doctrines are not applicable.  There was no "preconceived plan to avoid taxation"; rather, there were arm's-length stock sales between the trust and Fortrend where the parties agreed that Fortrend would be responsible for reporting and paying the Federal income taxes of the corporations.  In the absence of a nefarious scheme, when faced with the choice of liquidating the corporations or selling their stock the trust was not required to choose the result that would produce the highest tax liability.

Faced with a substantial estate tax liability, the trust chose to maximize the cash proceeds from the sales by selling the stock of the corporations rather than liquidating them. Had the trust known of Fortrend's illegitimate scheme to fraudulently offset the tax liabilities of the corporations, then we would be inclined to disregard the form of the stock sales in favor of respondent's contention. However, there are legitimate tax planning strategies to defer or avoid paying taxes, so it was not unreasonable for the trust to believe that Fortrend had a legitimate method of doing so. Respondent's contention that the trust should have known Fortrend intended to fraudulently offset the corporations' capital gains is insufficient to support a finding that the trust knew of Fortrend's nefarious plans, especially when coupled with the fact that respondent expressly stipulated that the trust did not know of the postclosing merger or contribution of inflated-basis stock by Fortrend.

Moreover, similar to the facts of Starnes v. Commissioner, T.C. Memo. 2011-63, there was an infusion of cash into the transaction, rather than a circular flow of cash. Fortrend obtained independent financing from Rabobank. While the details were unknown to the trust, the trust was aware that the stock purchases were financed by loans from Rabobank. Rabobank was an independent third party that lent funds to Fortrend at arm's length, conditioned upon several written agreements. Because the

trust would not release control over the corporations' bank accounts until it received the stock purchase price, Fortrend could not have paid for the stock without a loan from Rabobank. Therefore, the funds used to purchase the stock were genuine infusions of cash into the transaction, further leading us to conclude that the form of the stock sales should be respected.

An opinion in another transferee case with similar facts has recently been filed--<u>Feldman v. Commissioner</u>, T.C. Memo. 2011-297, holding the taxpayer liable as a transferee. However, in holding the taxpayer liable as a transferee, the Court in <u>Feldman</u> found that: (1) It was "absolutely clear" that the taxpayer was aware the stock purchaser had no intention of ever paying the tax liabilities; (2) the taxpayer did not conduct thorough due diligence of the stock purchaser; and (3) the "loan" used to purchase the stock was a sham because it was made by a shareholder of the purchaser and was not evidenced by a promissory note or other writing and the lending shareholder did not receive any security or collateral in exchange for the "loan". In our case, respondent failed to show that the trust had actual or constructive knowledge of Fortrend's fraudulent plans to offset the corporations' tax liabilities. Moreover, the loans to purchase the stock were made by a third party, evidenced by multiple written agreements, and supported by security interests.

Therefore, we reject any application of substance over form or its related doctrines to recast the stock sales as "asset sales followed by liquidating distributions" and instead find that the form of the stock sales should be respected.

VI. Conclusion

We conclude that respondent has not established that a fraudulent transfer occurred under Massachusetts law. In reaching our holdings herein, we have considered all arguments made by the parties, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered for petitioner.